**Vicki DELARIA, Plaintiff,**

v.

**AMERICAN GENERAL FINANCE, INC., Defendant.**

**No. CIV. 4–95–CV–90121.**

United States District Court,
S.D. Iowa,
Central Division.

March 12, 1998.

Rodney H. Powell, Norwalk, IA, for Plaintiff.

Kimberly J. Walker, Des Moines, IA, William M. Walsh, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

PRATT, District Judge.

### MEMORANDUM AND ORDER

#### I. Introduction

Plaintiff filed a six-count complaint against her former employer, alleging various claims

of discrimination and breach of contract. The employer filed a motion for summary judgment as to all claims. The court grants the employer's motion as to the breach of contract claims and denies its motion as to the discrimination claims.

## II. Factual Background

Plaintiff, Vicki DeLaria, was an employee of American General Finance (AGF) from August 1983 until she was fired on February 24, 1993.

AGF is a Delaware corporation that offers loans and insurance and purchases sales-finance contracts. AGF is headquartered in Evansville, Indiana and has more than 1,000 offices nationwide. Several branch offices were and are located in Des Moines, Iowa.

AGF originally hired DeLaria as a manager trainee in 1983. (DeLaria Dep. at 42.) At the time she was fired, DeLaria was the manager of AGF's Des Moines North branch. DeLaria had managed the Des Moines North branch since April of 1987. Prior to managing the Des Moines North branch, DeLaria managed AGF's Marshalltown branch from June 1985 to April 1987. (DeLaria Dep. at 47.)

DeLaria's district manager from April 1987 to March of 1992 was Jan Ross. (DeLaria Dep. at 57.) The district manager is responsible for supervising and reviewing operations of the AGF branch offices in her district, training branch managers, and developing business. (Bartow Aff. Ex. B ¶ 2.) The district manager may also train branch employees if needed. (Id.)

Hal Bartow replaced Jan Ross in March of 1992. Bartow was in DeLaria's branch office approximately three to eight days per month. (DeLaria Aff. ¶ 4.) DeLaria spoke with Bartow by telephone on a daily basis. (McClerran Aff. ¶ 5.)

DeLaria alleges in her affidavit:

I attended an AGF training meeting for sexual harassment in the spring of 1992. Hal Bartow looked up my skirt as I was walking down a stairway. Hal Bartow was at the bottom and to the side of the stairway. When I "caught his eye" and realized what he was doing, he winked at me.

This was before he was my district manager and may have been the first time that I met Mr. Bartow.

(DeLaria Aff. ¶ 3.) DeLaria also states in her affidavit:

In May, 1992, Mr. Bartow my district manager came into the office that I was managing to conduct a long form evaluation. It was at this time that he put his arm around my shoulder. This contact was unwelcome and I told him to "quit" or "stop." After I said this to him, he looked offended, his face turned red, he turned briskly around, and he walked quickly to the back office where he promptly closed the door. This was at the beginning of the long form evaluation. This was the beginning of the time that Mr. Bartow began to treat me differently, was rude to me, and also when I began to experience serious problems with the treatment that I was subjected to at the hands of Mr. Bartow. I am not aware of any instances when Mr. Bartow put his arm around male branch managers but I am aware that he put his arm around some of the females in their offices.

(DeLaria Aff. ¶ 5.) Traci Payne, a co-worker, witnessed the aforementioned incident and corroborates DeLaria's testimony. (Payne Aff. at 65–68.)

Bartow's review was conducted from May 5 through 8, and May 11 through 15, 1992. (Bartow Aff. Ex. B ¶ 5.) The "long-form report" was dated May 15, 1992. (Def.Ex. D.) Bartow listed 65 separate items. DeLaria states in her affidavit that the items were "extremely nit-picky and unusual." (DeLaria Aff. ¶ 7.) Bartow states that the items were "related to the branch's general business practices as well as specific customer loan applications and files." (Def. Statement of Material Facts ¶ 10.)

DeLaria claims that Bartow tried to demean her by making her clean out a storage area and by sending her on multiple errands to buy small, unnecessary items for the bathroom. (DeLaria Aff. ¶ 6.) These incidents allegedly occurred on or around the time of the May long-form review.

On May 18, 1992, DeLaria and an employee, Brian Parizek, had a loud argument at DeLaria's branch. (Def.Ex. E.) The substance of the argument is not clear, however, DeLaria complains that "the incident was so serious that it should have warranted the involuntary termination of Mr. Parizek." (DeLaria Aff. ¶ 9.) Bartow did not fire Parizek and instead transferred him to another branch. (Def. Ex. E ¶ 4.) Bartow then transferred an employee, Harlan DeBoer, who held the same position at another branch as Parizek, to DeLaria's branch. (Id.) Bartow made a written report to his superior, (Def.Ex. E), and DeLaria complains she neither saw the report, nor was given an opportunity to respond. Bartow's report describes various interviews with employee witnesses, Parizek, and DeLaria. Bartow summarizes his conversation with Parizek as follows:

> Employees agree its [sic] probably Brians [sic] fault to a certain extent, that he doesn't like being talked down to or fussed at and when he's told to do something that doesn't make since [sic] to him like three things at once he questions the Manager and the Manager takes offense to being questioned and thinks he doesn't respect her authority.

(Def. Ex. E ¶ 3.) The report also states: "The employees stated that the Manager has remarked that she was a little sheltered and protected by the previous D.M. and now she feels that she is not going to get the same treatment and may get shoved out because she is a woman Manager." (Def. Ex. E ¶ 3.) DeLaria complains that transferring and not firing Parizek "undermined [her] authority and [her] ability to be treated as an equal with my male counterparts in the Des Moines area." (DeLaria Aff. ¶ 9.)

Bartow admits that he showed a portion of DeLaria's long-form report to some male branch managers in the Des Moines area. (Bartow Dep. 83.) It is not clear exactly when this occurred. DeLaria claims that Bartow knew these documents were confidential and that the disclosures violated company policy.

DeLaria alleges that "Mr. Bartow also put his arm around my shoulder on two occasions on June 23, 1992. He put his arm around my shoulder and squeezed me. Later that same day, he put his arm around me as we were leaving a meeting in Cedar Rapids." (DeLaria Aff. ¶ 8.)

DeLaria claims that sometime in the fall of 1992, while she was at home for lunch, Bartow called her at home to reprimand her for making too many personal phone calls while at work. (DeLaria Aff. ¶ 24.) She states that she denied making too many personal calls and that he then got very angry and raised his voice. (Id.) DeLaria alleges that she began to cry from frustration and told Bartow that he was treating her unfairly and that "if I had not been a woman, I would never be subjected to this treatment. I told him that he was discriminating against me and harassing me because I was a woman." (Id.) DeLaria claims that Bartow responded, in a threatening manner, that she "had better not say that to anyone ever again if I knew what was for good for me."(Id.)

On or about November 10, 1992, Harold DeBoer resigned from AGF. DeBoer then allegedly sent a letter to Bartow. (Def.Ex. F.) It is not clear when the letter was written, sent, or received. The letter purports "to state the reasons behind his resignation as follows": (1) DeLaria's "abuse of personal phone calls"; (2) DeLaria's "falsification of the mileage cards"; (3) DeLaria's "having clients fill out blank loan papers as well as having clients sign loan documents on different days"; (4) DeLaria's "total lack of training"; (5) DeLaria's "constantly writing checks out to AGF and using it as personal bank"; (6) "No PDN's pulled during the last half of the month until the last day or two of the month"; (7) DeLaria's "abuse of lunch hour, taking a lunch break then bringing food back to work and eating it there taking at least an extra 20 mins."; and (8) DeLaria's "lying to me and clients." (Id.) The letter also asserts that DeLaria ran a credit check on herself, held onto insufficient-funds checks, and violated client confidentiality with regard to a client named Hartman. (Id.)

Enclosed was a partial copy of an allegedly signed, blank loan document. (Def.Ex. G.) The document was signed Bruce Allen Reha.

Mr. Reha submitted an affidavit denying that he signed such a document. (Reha Aff.)

Traci Payne stated in her deposition that DeBoer collected notes on DeLaria and reported them to Bartow. (Payne Dep. at 42–54.)

DeLaria alleges that "sometime in late 1992 or early 1993" Bartow called her at home in the evening and told her that she needed to find a place to live for a person he was transferring to her office and that if she could not find such a place, then DeLaria would have to allow that person to live with her. (DeLaria Aff. ¶ 25.)

From January 25 through January 29, 1993, AGF auditor Andy Kuzmitsky conducted an audit of DeLaria's Des Moines North branch operations. (Bartow Aff. ¶ 23.) The audit report was completed on February 17, 1993. (Def.Ex. L.) At some point prior to completing the report, the results of the audit were reviewed with Bartow. (Id. at 1.) The report summarized procedures as "unsatisfactory" and listed several deficiencies, some of which matched the May 1992 long-form report deficiencies. DeLaria claims that the unsatisfactory audit was the result of Bartow's refusals to hire additional staff for DeLaria. (DeLaria Aff. ¶ 16.) The problems that appeared on both the May 1992 report and the audit were the following: insufficient-funds checks not being charged back on the same day received from the bank, cash-count summaries not initialed, manager not reviewing paid bills each month, and dealer files not complete or updated. (Bartow Aff. ¶ 25.)

On February 9, 1993, Bartow met with DeLaria about DeBoer's allegations. Bartow then wrote a report to the Director of Operations, Bill Ryan, listing her response to each of DeBoer's allegations in order. (Def.Ex. K.)

DeLaria admits that Kuzmitsky saw her sign some sort of blank loan document and told her that she could not have people do so. This incident was not included in the audit report. (DeLaria Aff. ¶ 22.) DeLaria mentioned this incident to Bartow at their February 9 meeting. DeLaria describes the controversy surrounding this incident as follows:

Mr. Bartow accused me of breaking the truth-in-lending laws by allowing customers to sign blank loan documents. I explained that I had been trained that it was acceptable and legally permissible to sign blank loan documents in those situations where husbands and wives were co-signing loans. On those occasions, one spouse stopped by the office, completed the paperwork, and signed a blank loan paper. Then, before the second spouse came into the office to sign the loan document, the information was completed. When the second spouse came into the office, I would sit down with them to discuss all of the information on the loan papers. I had never been informed that this was any sort of violation of either company policy or the Truth–in–Lending Act before Andy Kuzmitsky told me that this practice was not acceptable. However, I believe that this procedure was widely practiced at AGF. I told Mr. Bartow that as soon as company auditor Andy Kuzmitsky told me the practice was not proper in January, 1993, I stopped and had not done it after that time. I had never been told that there was a problem with permitting customers to complete a loan application and sign the loan (closing) papers on different days. I had asked Mr. Bartow if a loan application and loan closing must be completed on the same day. He did not tell me that this was a prohibited practice.

. . . .

I deny that I violated the federal Truth–in–Lending Act by having "clients sign blank loan documents" and complete documents on different days... I believe that this is not a violation of the Truth–in–Lending Act. It is possible that I may have inadvertently violated the Truth–in–Lending Act, but only because of the way in which I was trained, by AGF and by adhering to the standard practice among AGF employees.

(DeLaria Aff. ¶¶ 11(c), 19.)

Bartow states that he decided DeLaria should be fired on February 9, 1993. (Bartow Aff. ¶ 26.) He then wrote a memorandum to AGF's Termination Review Committee (TRC) recommending DeLaria's

dismissal. (Def.Ex. O.) The memorandum refers to various documents and summarizes various reasons Bartow thought DeLaria should be fired. Included was the statement that DeLaria was violating truth-in-lending laws.

On February 22, 1993, the TRC informed Bartow that DeLaria was to be terminated for misconduct; namely, DeLaria had violated AGF policy and federal law by having customers sign blank loan documents.

DeLaria submitted two affidavits from former branch managers that state the signing of blank loan documents was a common and accepted practice at AGF institutions. (Harken Aff.; Pool Aff.)

DeLaria submitted affidavits from AGF employees that allege sexist comments by Bartow made to co-workers. (Harken Aff.; McLerren Aff.) One such affidavit states that Bartow claimed he did not want to hire women for management unless they were "cute." (Harken Aff.)

The day after she was fired, DeLaria complained of sexual harassment to Mary Huth, a member of AGF's Termination Review Committee. (DeLaria Aff. ¶ 27.) AGF began an investigation approximately two months later. (Ex. M.) AGF responded in writing to DeLaria's complaint in June of 1993. There is some controversy as to who was interviewed in the investigation of DeLaria's complaint. DeLaria contends that neither Bartow, nor any "witnesses" to the harassment were interviewed.

### III. Procedural Background

DeLaria filed claims with the Iowa Civil Rights Commission and the Equal Employment Opportunity Commission on August 12, 1993. DeLaria requested and received right-to-sue letters from each commission in March of 1995.

DeLaria filed her initial complaint on February 22, 1995. She filed an amended complaint on June 27, 1995.

AGF filed its motion for summary judgment on November 21, 1997. A hearing was held on January 29, 1998.

### IV. Legal Analysis

#### A. Summary Judgment in Employment Discrimination Cases

The purpose of summary judgment is to "pierce the boilerplate of the pleading and assay the parties' proof in order to determine whether trial is actually required." 11 James Wm. Moore, et al., *Moore's Federal Practice* ¶ 56.02 (3d ed.1997)(quoting *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 794 (1st Cir.1992)). Summary judgment "allows courts and litigants to avoid full-blown trials in unwinnable cases, thus conserving the parties' time and money and permitting courts to husband scarce judicial resources." *Id.*

The precise standard for granting summary judgment is well-established and oft-repeated: the moving party is entitled to summary judgment on a claim only upon a showing that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c).[1] In applying this standard, the court must view the facts in the light most favorable to the nonmoving party and give her the benefit of any fairly and reasonably drawn inference. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

---

**1.** Rule 56 of the Federal Rules of Civil Procedure states:

Rule 56. Summary Judgment

(a) For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

(b) For Defending Party. A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a)-(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)). An issue of material fact is genuine if it has a real basis in the record. *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1355–56. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986).

Rule 56(a) and (b) establish that the party moving for summary judgment must come forward with an initial showing that it is entitled to judgment. Fed.R.Civ.P. 56(a)-(b). When the moving party does not bear the burden of proof at trial, as is the case for the moving party here, the burden on the moving party "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). It is, however, "not enough to move for summary judgment without supporting the motion in any way or with a conclusory assertion that the plaintiff has no evidence to prove his case." *Celotex*, 477 U.S. at 328, 106 S.Ct. at 2555 (White, J., concurring).

When a moving party has carried its burden, the opposing party is required to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. The facts on which the nonmovant may rely must be admissible at trial, but need not be in admissible form as presented in the opposition. *See, e.g., Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *Duluth News–Tribune, Inc. v. Mesabi Publ'g Co.*, 84 F.3d 1093, 1098 (8th Cir.1996); *Leonard v. Dixie Well Serv. & Supply*, 828 F.2d 291, 295 (5th Cir.1987). Although "direct proof is not required to create a jury question, ... to avoid summary judgment, 'the facts and circumstances relied upon must attain the dignity of substantial evidence and

must not be such as merely to create a suspicion.' " *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir.1985) (quoting *Impro Prods., Inc. v. Herrick*, 715 F.2d 1267, 1272 (8th Cir.1983)). The necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

■ The Eighth Circuit Court of Appeals has repeatedly cautioned that summary judgment should seldom be used in employment-discrimination cases. *See Smith v. St. Louis Univ.*, 109 F.3d 1261, 1264 (8th Cir.1997); *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir.1994); *Johnson v. Minnesota Historical Soc'y*, 931 F.2d 1239, 1244 (8th Cir.1991); *Hillebrand v. M–Tron Indus., Inc.*, 827 F.2d 363, 364 (8th Cir.1987). Summary judgment is appropriate only in "those rare instances where there is no dispute of fact and where there exists only one conclusion." *Johnson*, 931 F.2d at 1244; *see generally* Ann C. McGinley, *Credulous Courts and the Tortured Trilogy: The Improper Use of Summary Judgment in Title VII and ADEA Cases*, 34 B.C. L.Rev. 203 (1993). The Eighth Circuit has stated that "[b]ecause discrimination cases often depend on inferences rather than on direct evidence, summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant." *Crawford*, 37 F.3d at 1341.

■ Due to the difficulties of proving discriminatory intent and the importance of anti-discrimination policy, the court must be vigilant to avoid crabbed notions of relevance and rational inference that could serve to take submissible cases from the jury. *See Estes v. Dick Smith Ford, Inc.*, 856 F.2d 1097, 1103 (8th Cir.1988)(Arnold, J.)(warning against "crabbed notions of relevance and mistrust of juries" and quoting *Riordan v. Kempiners*, 831 F.2d 690, 697–698 (7th Cir. 1987) (Posner, J.)). To this end the court is mindful of Circuit Judge Selya's general admonition:

The precincts patrolled by Rule 56 admit of no room for credibility determinations, no room for the measured weighing of

conflicting evidence such as the trial process entails, no room for the judge to superimpose his own ideas of probability and likelihood (no matter how reasonable those ideas may be) upon the carapace of the cold record.

*Greenburg v. Puerto Rico Maritime Shipping Auth.*, 835 F.2d 932, 936 (1st Cir.1987). The court especially recognizes Justice Scalia's recent statement: "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Oncale v. Sundowner Offshore Serv.*, —— U.S. ——, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201 (1998).

### B.  DeLaria's Claims

DeLaria made several claims with varying levels of specificity in her amended complaint.  DeLaria has withdrawn Count III, negligent misrepresentation, and Count VI, breach of duty of good faith and fair dealing. (Pl.'s Sum. J. Br. at 2.) Counts I, II, IV, and V remain and are the subject of this opinion. The court will consider each claim in order.

Count I of DeLaria's complaint alleges a "violation of Title VII of the Civil Rights Act of 1964, specifically, 42 U.S.C. § 2000e–2(a)(1)." [2]    (Amn.Compl.¶ 13.)    DeLaria's complaint further states that she:

> was treated differently than would a similarly situated male employee, to-wit: (a) Plaintiff was subjected to unwelcome and inappropriate touching by her male supervisor; (b) Plaintiff's male supervisor had an explicit policy of not putting women into management positions; (c) Plaintiff's male supervisor used inappropriate and vulgar language when describing female employees, including Plaintiff; and (d) Plaintiff

was subjected to different performance standards than male employees.

(Amn.Compl.¶ 12.)  AGF and DeLaria treat Count I as alleging two separate theories for recovery:  (1)  hostile-environment harassment and (2) quid pro quo harassment.

### 1.  Hostile–Environment Harassment

■■■  Title VII prohibits employers from requiring their female employees to run a gauntlet of hostility and abuse for the privilege of being allowed to work and make a living.  *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). There are five elements to DeLaria's hostile-environment claim: (1) she belongs to a protected group; (2) she was subject to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) AGF knew or should have known of the harassment and failed to take appropriate remedial action.  *Burns v. McGregor Elec. Indus., Inc.*, 955 F.2d 559, 564 (8th Cir.1992).[3]

#### (a)  Protected-group status

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, *sex*, or national origin."  42 U.S.C. § 2000e–2(a)(1) (emphasis added).  DeLaria is female and therefore is a member of a protected class.

#### (b)  Unwelcome sexual harassment

■■■  Although it is hard to imagine an objectively-hostile environment or a sex-for-job-benefit threat that would be "welcome," the rule that the sexual or sex-based behav-

---

**2.**   42 U.S.C. § 2000e–2(a)(1) states:
(a) Employer practices
It shall be an unlawful employment practice for an employer—
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin....

**3.**  For a good starting point regarding burden shifting and hostile-environment claims, see Ernest C. Hadley & George M. Chuzi, *Sexual Harassment: Federal Law* ch. 3.I.A.1 (Dewey Publications, 1997 ed.), *available in* Westlaw (use "find" search, then enter SEXHARASS CH. 3.I.A.1.).

ior at work is unwelcome ensures consensual work place sex does not provide the basis for a civil action. *See Meritor*, 477 U.S. at 68, 106 S.Ct. at 2406 (stating that unwelcomeness is the "gravamen of any sexual harassment claim"); Susan Estrich, *Sex at Work*, 43 Stan. L.Rev. 813, 26–834 (1991) (discussing unwelcomeness requirement). The parties in this case do not contend that any of the alleged behavior or acts was welcomed or in any way encouraged by DeLaria.

### (c) Harassment based on sex

■ The acts alleged to support a hostile-environment sexual-harassment claim do not need to be explicitly or overtly "sexual" in nature. *Kopp v. Samaritan Health Sys., Inc.*, 13 F.3d 264, 269 (8th Cir.1993); *Hall v. Gus Constr. Co.*, 842 F.2d 1010, 1014 (8th Cir.1988). The key issue is "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Harris*, 510 U.S. at 25, 114 S.Ct. at 372 (Ginsburg, J., concurring); *see generally* Estrich, *supra*, at 840–42 (discussing the potential differences between man-to-man conduct and man-to-woman conduct). "Intimidation and hostility toward women because they are women can obviously result from conduct other than explicit sexual advances." *Stacks v. Southwestern Bell Yellow Pages, Inc.*, 27 F.3d 1316, 1326 (8th Cir.1994) (quoting *Hall*, 842 F.2d at 1014); *see generally*, *McKinney v. Dole*, 765 F.2d 1129, 1138–40 (D.C.Cir.1985)(J. Skelly Wright, J.). "[H]arassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex." *Oncale*, —— U.S. ——, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201. Of course, explicit sexual advances are the most direct proof of sexual harassment. This issue was not extensively briefed by the parties and the court will, in the interest of brevity, defer discussion under this point to the following section.

### (d) Severe, patterned, and pervasive: affecting terms, conditions, or privileges

■ Hostile-environment harassment is actionable under Title VII when it is suffi-ciently patterned and pervasive. *Hall*, 842 F.2d at 1014. "To determine whether a work environment is hostile or abusive, the adjudicator must consider all of the circumstances, including:'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"*Kopp*, 13 F.3d at 269 (quoting *Harris*, 510 U.S. at 23, 114 S.Ct. at 371). The Eighth Circuit stated in *Burns v. McGregor Electronic Industries, Inc.*, 955 F.2d 559, 564 (8th Cir.1992):

> Under the totality of the circumstances analysis, the district court should not carve the work environment into a series of discrete incidents and then measure the harm occurring in each episode. Instead, the trier of fact must keep in mind that "each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created may exceed the sum of the individual episodes." *Robinson v. Jacksonville Shipyards, Inc.*, 760 F.Supp. 1486, 1524 (M.D.Fla.1991). "A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents but on the overall scenario." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1484 (3d Cir.1990).

■ Severity is judged objectively. *Harris*, 510 U.S. at 21, 114 S .Ct. at 370; *see generally* Estrich, *supra*, at 845–46 (warning of dangers surrounding "reasonableness" or "reasonable person" determinations). Psychological harm to the plaintiff is relevant, as one factor among many, but Title VII does not require "concrete psychological harm." *Kopp*, 13 F.3d at 269. Even conduct that "does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing their careers." *Harris*, 510 U.S. at 22, 114 S.Ct. at 371.

■ In the light most favorable to the plaintiff, DeLaria has generated a material issue of fact as to whether she was subject to

hostile-environment sexual harassment. Especially in light of Bartow's allegedly having looked up DeLaria's dress and winking, the court would find it difficult to say that Bartow putting his arm around DeLaria on three occasions would not in itself present a potentially intimidating and offensive environment: Bartow was DeLaria's supervisor, the two had daily contact by phone, and they worked in the same offices approximately three to eight out of every twenty to twenty-two working·days. Furthermore, DeLaria alleges she clearly expressed her feelings that such touching was unacceptable to her, yet it is alleged he did it twice more. There is also corroborating evidence, although corroboration should be entirely unnecessary,[4] that at least one touching was clearly "sexual" in nature. (Payne Aff. at 65–68.)

AGF points to a recent per curiam decision by the Eighth Circuit, *Spencer v. Ripley County State Bank,* 123 F.3d 690 (8th Cir. 1997), and argues that Bartow's allegedly sexual conduct, even if true, would be insufficient to establish a hostile environment. As is common in opinions issued per curiam, the factual details and legal analysis are set forth in meager portion. Although the court of appeals affirmed the district court's grant of summary judgment, and the case ostensibly involved allegations of ten separate incidents where a boss put his arm around an employee and occasionally pulled on the employee's bra strap, it is not at all clear what the substance of the depositions were or in what way they might have contradicted the plaintiff's testimony. Nowhere does the court of appeals state that such allegations are per se insufficient to generate a jury question.

More recent and more persuasive than *Spencer,* is *Hathaway v. Runyon,* 132 F.3d 1214 (8th Cir.1997). *Hathaway* was also a sexual harassment case. The court of appeals there held it was reversible error for the trial court to take away a jury verdict in favor of the plaintiff. *Hathaway,* 132 F.3d at 1223. In an extensive and comprehensive opinion, the court found that two "sexually suggestive" touchings combined with later laughter and "suggestive noises" were suffi-

cient to establish a hostile environment. *Id.* at 1222 (citing *Hirase–Doi v. U.S. West Communications, Inc.,* 61 F.3d 777, 780–83 (10th Cir.1995) (a few incidents of unwelcome physical touching combined with winks and intimidating stares with possible sexual overtones is sufficient to establish a hostile work environment)). The *Hathaway* court clearly did not require corroboration or some cold and mechanical count of the number of incidents. *Hathaway* makes perfectly clear that "[a] work environment is shaped by the accumulation of abusive conduct" and that the exposure to harassing conduct "need not have been continuous to have been pervasive." *Id.*

Also alleged is a pattern of harassing disciplinary and investigative behavior. AGF completely ignores these allegations in its motion. DeLaria alleges zealous criticism for minor errors and on ongoing collaboration between Bartow and one of Delaria's disgruntled employees to catch DeLaria for all kinds of misbehavior. There exists both affidavit testimony and some documentary evidence that DeLaria was singled-out ·from her male counterparts for investigation and disciplinary action. *See Stacks,* 27 F.3d at 1326–27 (holding that discriminatory treatment of plaintiff in connection with disciplinary actions support hostile-environment claim); *see also Hathaway,* 132 F.3d at 1222 (holding that formal complaint made to plaintiff's supervisors by harassing co-worker regarding plaintiff's work performance could be evidence of hostile environment). Several incidents are also alleged that might be seen as purposefully demeaning and directed at DeLaria because of her gender.

There is a sufficient nexus between all of these actions and DeLaria's gender. There is, for example, some evidence that Bartow revealed DeLaria's evaluations to male counterparts but did not do the same to them. There is also evidence that Bartow may have made statements directly and indirectly establishing that he has a sexist mentality and a hostility to women in management. Furthermore, Bartow's alleged sexual conduct could also be utilized by the jury to establish

---

**4.** *See* Estrich, *supra,* at 847–53 (comparing requirement of corroboration in sex-harassment cases to now discredited requirement of corroboration in rape cases).

a nexus between Bartow's non-sexual conduct and a gender-based motivation.

Taken together, Bartow's behavior culminating in her dismissal could lead a rational jury to conclude that DeLaria's work environment was hostile and abusive and that but for her being a woman it would not have been so.

### (e) Employer liability

■ To satisfy the last element of her sexual-harassment claim, DeLaria is required to prove "the employer knew or should have known of the harassment, yet failed to take 'proper remedial action.'" *Brown v. City of St. Louis Pub. Safety Dep't,* 133 F.3d 921, 1997 WL 792460 (8th Cir.1997) (per curiam) (quoting *Quick v. Donaldson Co.,* 90 F.3d 1372, 1377 (8th Cir.1996)). Even though the alleged harasser was a supervisor of the plaintiff, the court must not automatically impute knowledge of harassment to the employer. *See Davis v. City of Sioux City,* 115 F.3d 1365, 1368 (8th Cir.1997) ("Despite the fact that the plaintiff's supervisor had been the source of the harassment, we [do] not automatically impute liability to the [employer] or alter the knew or should have known language typically used in hostile environment cases.")

The court of appeals in *Davis* quoted extensively from its previous decision in *Kinman v. Omaha Public School District,* 94 F.3d 463 (8th Cir.1996):

> The Supreme Court in *Meritor Savings* declined to set out a generally applicable standard of liability for employers under Title VII. Instead, the Court suggested that common law agency principles should guide courts in determining employer liability on a case-by-case basis. For example, when a supervisor uses the power delegated specifically to him by his employer to discriminate on the basis of sex, that employee's actions should be imputed to the employer. On the other hand, in a hostile environment sexual harassment case, the usual basis for a finding of agency will often disappear. In such cases, the employer should not be held liable unless the employer itself has engaged in some degree of culpable behavior. For example,

the employer could be held liable if it knew or should have known of the harassment and failed to take appropriate remedial action.

*Davis,* 115 F.3d at 1368–69 (quoting *Kinman,* 94 F.3d at 469).

■ AGF argues that because DeLaria did not "complain about or inform AGF about Bartow's alleged conduct" until after she was fired, DeLaria cannot show AGF knew or should have known. DeLaria admits not utilizing AGF's complaint procedures while she was employed and that she did not formally complain until the day after her termination.

If this case were limited to the alleged sexual conduct by Bartow, the court would feel compelled by the case law of this circuit to agree with AGF. However, looking to the language quoted above from the *Kinman* opinion, Bartow's harassing behavior involved "specifically delegated powers" to review DeLaria's performance and to otherwise affect the conditions and duties of her employment. *Kinman,* 94 F.3d at 469. Knowledge and liability, therefore, may be imputed to AGF as the employer.

Furthermore, Bartow's letter to his superior (Def.Ex. E), the person with whom DeLaria was supposed to file all complaints about Bartow, provides sufficient proof for the jury to determine that the company had actual notice of potentially discriminatory behavior through the letter and through the knowledge of DeLaria's complaints by other employees. This letter combined with AGF's failure to investigate or take remedial action may fairly be seen to establish "culpable neglect" on the part of AGF. *See Kinman,* 94 F.3d at 469; *see also Van Jelgerhuis v. Mercury Fin. Co.,* 940 F.Supp. 1344, 1365 (S.D.Ind.1996).

AGF also argues it took "reasonably prompt remedial action." AGF's argument is premised on a lack of notice until the end of February 1993—the date of DeLaria's post-termination complaint. It is possible to conclude, however, that notice (as stated in the above paragraphs) occurred as early as May 1992. AGF's investigation did not start until March of 1993, and until after DeLaria

was fired. Such a delay could be interpreted by the jury to have been unreasonable and improper.

### 2. Quid Pro Quo Harassment

■ Quid pro quo harassment occurs when sexual conduct is a condition of tangible employment benefits, including salary, promotion, and continued employment. *See generally,* Catherine A. MacKinnon, *Sexual Harassment of Working Women: A Case Study of Sex Discrimination* 32 (1979) (defining quid pro quo harassment as "the more or less explicit exchange: the woman must comply sexually or forfeit an employment benefit . . . 'put out or get out.' "). The classic case of quid pro quo harassment occurs when an employee is explicitly told to have sex or be fired. The threat or proposition need not be express, however, to be actionable. To encompass all of the potential vagaries, the Eighth Circuit has set out the following four elements of a prima facie, quid pro quo harassment case: (1) the plaintiff was a member of a protected class; (2) the plaintiff was subjected to unwelcome sexual harassment in the form of sexual advances or requests for sexual favors; (3) the harassment was based on sex; and (4) the plaintiff's submission to the unwelcome advances was an express or implied condition for receiving job benefits or the plaintiff's refusal to submit resulted in a tangible job detriment.[5] *See Cram v. Lamson & Sessions Co.,* 49 F.3d 466, 473 (8th Cir.1995).

The parties appear to agree that the allegations and proof would require a *McDonnell Douglas* style analysis.[6] *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Ryther v. KARE 11,* 108 F.3d 832 (8th Cir.1997)(en banc). The Eighth Circuit described *McDonnell Douglas* burden shifting as follows:

In discrimination cases, it is now well settled that a plaintiff's presentation of a prima facie case creates a legal presumption of unlawful discrimination. This presumption places an obligation upon the employer to produce evidence of a legitimate, nondiscriminatory reason for the plaintiff's discharge. If the employer carries this burden, the legal presumption of unlawful discrimination "drops out of the picture."

. . . .

In sum, when the employer produces a nondiscriminatory reason for its actions, the prima facie case no longer creates a legal presumption of unlawful discrimination. The elements of the prima facie case remain, however, and if they are accompanied by evidence of pretext and disbelief of the defendant's proffered explanation, they may permit the jury to find for the plaintiff. This is not to say that, for the plaintiff to succeed, simply proving pretext is necessarily enough. We emphasize that evidence of pretext will not by itself be enough to make a submissible case if it is, standing alone, inconsistent with a reasonable inference of . . . discrimination. Furthermore, as the *Hicks* Court explained, the plaintiff must still persuade the jury, from all the facts and circumstances, that the employment decision was based upon intentional discrimination.

*Ryther,* 108 F.3d at 836–38 (citations and footnotes omitted).

This opinion will discuss each element of DeLaria's quid pro quo claim and, where appropriate, the various burden shifts.

#### (a) Protected-group status

As stated previously, Title VII prohibits an employer from discriminating "against any

---

**5.** "In the situation of quid pro quo sexual harassment by a supervisor, where the harassment results in a tangible detriment to the subordinate employee, liability is imputed to the employer." *Davis v. City of Sioux City,* 115 F.3d 1365, 1367 (8th Cir.1997) (citing *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 76, 106 S.Ct. 2399, 2410, 91 L.Ed.2d 49 (1986) (Marshall, J., concurring in judgment)).

**6.** The alternative would be *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)(discussing "direct evidence" analysis and burden shifting). *See* Ernest C. Hadley & George M. Chuzi, *Sexual Harassment: Federal Law* ch. 2.I. (Dewey Publications 1997). The court notes that quid pro quo claims are usually treated as strictly direct evidence cases. This case is, therefore, a bit unusual.

individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, *sex*, or national origin." 42 U.S.C. § 2000e–2(a)(1) (emphasis added). DeLaria is female and therefore is a member of a protected class.

### (b) Unwelcome sexual advances or requests for sexual favors

■■■ The record as it now stands is sufficient for a jury to determine Bartow made unwelcome sexual advances or requests for sexual favors. Once again, the record is read in the light most favorable to DeLaria's claims. In this light, Bartow's having looked up DeLaria's dress and winked at her, combined with the three times he put his arm around DeLaria, may convince a rational jury that Bartow was making sexual advances or requests to DeLaria.

### (c) Harassment based on sex

Normally a sufficient showing there were sexual advances or requests for sexual favors will necessarily imply that the harassment was based on "sex." *See Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir.1982). This element is meant, however, to address the somewhat unusual event of a bisexual employer engaging in equally offensive sexual conduct with both male and female employees. *Id.; see generally,* Estrich, *supra,* at 819–20 (discussing the added severity of sexual harassment in the male-to-female scenario). Nevertheless, there is no allegation here that Bartow's alleged conduct would not be "based on sex."

### (d) Express or implied condition of benefit or refusal resulting in detriment

AGF makes three arguments under this element: (1) the delay between the alleged refusal and the termination proves there was no connection as a matter of law; (2) DeLaria has not shown any evidence that the Termination Review Committee (TRC) knew of any male employee TILA violations and therefore can not rebut AGF's stated legitimate business reason for termination; and (3) DeLaria argues only that her termination was "incorrect or unfair" which is "insuffi-

cient to establish pretext."(Def. Sum. J. Br. at 6.)

### (i) Delay

■■■ Although there was a significant amount of time between DeLaria's "refusal" of Bartow's alleged arm-around advance and DeLaria's termination, the alleged facts might fairly demonstrate that the refusal led directly and immediately to Bartow's negative reviews of DeLaria and got the ball rolling for continued harassment and eventual termination. In the light most favorable to DeLaria, the delay between refusal and termination does not mandate summary judgment as a matter of law, rather it constitutes a factual issue for the jury to consider in context.

### (ii) Male employee TILA violations

■■■ AGF states that it had legitimate reasons for firing DeLaria totally independent of any quid pro quo harassment. The TRC allegedly believed DeLaria violated AGF policy and federal law by having customer's fill out blank loan documents. Under *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507–12, 113 S.Ct. 2742, 2747–50, 125 L.Ed.2d 407 (1993), the defendant's offer of a legitimate reason for termination shifts the burden of production to the plaintiff to provide evidence that, despite the legitimate reasons stated, the real reason was discrimination. *See* Julie Tang & Hon. Theodore M. McMillian, *Eighth Circuit Employment Discrimination Law: Hicks and its Impact on Summary Judgment,* 41 St. Louis U. L.J. 519 (1997).

AGF argues that unless DeLaria can show that male employees were treated differently than DeLaria regarding the same conduct, DeLaria fails to sustain her burden and must suffer summary judgment. The court does not agree. Differential treatment is one way to rebut a facially legitimate reason for termination, but it is by no means the only way. *See Parker v. Secretary, United States Dep't of Housing and Urban Dev.,* 891 F.2d 316, 321 (D.C.Cir.1989) (listing various means of demonstrating pretext). DeLaria's evidence under part *(iii)* is sufficient to avoid summary judgment.

### (iii) Incorrectness or unfairness alone

The court rejects AGF's argument that DeLaria challenges her termination strictly on the grounds that it was incorrect or unfair and that summary judgment is therefore appropriate under *Gill v. Reorganized School District R–6*, 32 F.3d 376 (8th Cir. 1994). Unlike the case in *Gill*, DeLaria has submitted proof of quid pro quo harassment and other, indirect evidence of discrimination and discriminatory statements by her supervisor. *See Gill*, 32 F.3d at 379 (finding that only evidence of discrimination was that superintendent knew plaintiff was black). It is not the law that plaintiffs, such as DeLaria, can never challenge the correctness of a purported business decision or the fairness of procedures surrounding the decision. *See Fischbach v. District of Columbia Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C.Cir.1996)("Evidence indicating that an employer misjudged an employee's performance or qualifications is, of course, relevant to the question whether its stated reason is a pretext for masking prohibited discrimination."); *Landon v. Northwest Airlines, Inc.*, 72 F.3d 620, 624–25 (8th Cir.1995) (even where worker tested positive for marijuana (undisputedly facially legitimate reason), fact that he was discriminatorily targeted by management sufficient to prove pretext); *O'Bryan v. KTIV Television*, 64 F.3d 1188, 1191–92 (8th Cir.1995); *see also* Tang, *supra*, at 528–30. Especially in cases like DeLaria's, where other evidence corroborates a discriminatory reality, an incorrect or unfair decision can be used as proof to defeat a motion for summary judgment.

Here DeLaria has presented evidence that the TRC relied heavily, if not exclusively, on Bartow's conclusory representations of her allegedly improper or illegal conduct. The TRC never interviewed DeLaria. Furthermore, there is some evidence that Bartow terminated similarly situated employees without approval from the TRC. (Harken Aff.) These items of proof are sufficient, in the light most favorable to DeLaria, to show that the TRC was nothing but the cat's paw of Bartow's decision to have DeLaria terminated for refusing his advances. *See, e.g., Webb v. St. Louis Post–Dispatch*, 51 F.3d

147, 149 (8th Cir.1995) ("[t]his circuit will not sterilize a seemingly objective decision to fire an employee when earlier discriminatory decisions have infected it."); *Abrams v. Lightolier, Inc.*, 50 F.3d 1204, 1213–14 (3d Cir.1995) (there was sufficient evidence from which a jury could reasonably conclude that plaintiff's immediate supervisor, who may have harbored a discriminatory animus and who participated in a decision to fire plaintiff, was a decision-maker for purposes of plaintiff's discharge); *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir.1990) (if a committee "acted as the conduit of a [supervisor's] prejudice—his cat's-paw—the innocence of its members would not spare the company from liability"); *Roebuck v. Drexel Univ.*, 852 F.2d 715, 727 (3d Cir.1988) ("[I]t plainly is permissible for a jury to conclude that an evaluation at any level, if based on discrimination, influenced the decision-making process and thus allowed discrimination to infect the ultimate decision.").

### 3. Breach of Express or Implied Contract

■ DeLaria claims that AGF's employee handbook created either an express or an implied contract, the terms of which AGF breached with her termination. AGF has produced a 1992 employee handbook which contains on page 1–2b (first full page past the table of contents) the following section:

> **b. Employment Policy.** Employment is not for a stated period and may be terminated at the will of either the company or the employee. Nothing in this manual or in the company's policies, practices or procedures should be read as a guarantee of employment, a commitment to provide employment, or a promise to continue any terms or conditions of existing employment. Just as employees are free to terminate their employment with the company at any time, the company is also free to terminate the employment of any of its employees at any time.

(Ex. V.)

According to Iowa law, such an express disclaimer negates the existence of an express or implied contract in the employment context. *See Anderson v. Douglas & Loma-*

*son Co.*, 540 N.W.2d 277, 287 (Iowa 1995). DeLaria does not claim or provide any proof that this provision was not in effect at any time during her employment. DeLaria instead claims she did not read the provision. It appears that such a claim has been rejected by the Iowa Supreme Court. *Anderson,* 540 N.W.2d at 285. DeLaria cites no contrary authority that discusses employee handbooks that have express disclaimers such as the one in this case. AGF's request for summary judgment as to DeLaria's remaining contract claims is therefore granted.

The following is **HEREBY ORDERED:**

1. Defendant's Motion for Summary Judgment is **GRANTED** as to Counts IV and V of Plaintiff's Amended and Substituted Complaint.

2. Defendant's Motion for Summary Judgment is **DENIED** as to Counts I and II.

3. Plaintiff **VOLUNTARILY DISMISSES** Counts III and VI.