**United States Court of Appeals**
**FOR THE EIGHTH CIRCUIT**

_____

No. 96-4241

_____

| | | |
|---|---|---|
| Mary Jane Hathaway, | * | |
| | * | |
| Plaintiff - Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Nebraska. |
| Marvin Runyon, Postmaster General, | * | |
| | * | |
| Defendant - Appellee. | * | |

_____

Submitted: September 9, 1997
Filed: December 29, 1997

_____

Before McMILLIAN, HANSEN, and MURPHY, Circuit Judges.

_____

MURPHY, Circuit Judge.

Mary Jane Hathaway sued her employer, Marvin Runyon, Postmaster General, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., claiming sexual harassment and discriminatory retaliation. The jury found for Hathaway on the sexual harassment claim and awarded her $75,000 in compensatory damages, but it found for Runyon on the retaliation claim. The district court then granted Runyon's motion for judgment as a matter of law on the harassment claim and ordered that judgment be entered in his favor in all respects. Hathaway appeals from only that portion of the judgment that deprives her of the jury verdict on her sexual harassment claim. We reverse.

I.


We state the facts in the light most favorable to Hathaway, as we must when deciding whether the jury verdict was properly overturned. See Ryther v. KARE 11, 108 F.3d 832, 844 (8th Cir.) (en banc), cert. denied, 117 S.Ct. 2510 (1997).


Hathaway had been employed by the postal service for twelve years at the main postal facility in Omaha, Nebraska when the events about which she complains took place. She worked both as a distribution clerk and a relief expediter on a shift from 2:30 pm to 11:00 pm. She received a higher level of pay for the expediting work. Her work generally involved labeling mail on the flat sorter and dispatching mail from it for pickup by mail trucks. The flat sorter is an automated machine that sorts pieces of mail that are larger than a standard letter envelope and labels them according to destination.


Hathaway alleged that she suffered from a hostile work environment based on sex that began with several incidents involving her coworker, Neal Norris. Norris began to act differently towards her in August of 1992, while he was training her for expediting duties. He started getting physically close and making peculiar comments, telling her that other workers believed they were romantically involved. This change in his behavior made her uncomfortable, and she tried to respond in a way that made it clear that his sexual interest in her was unwelcome. She told him that they both knew that any rumors about them would be untrue.


His conduct became more aggressive, however, and he made physical sexual advances. During the Christmas rush in December of 1992, he hit her on the buttocks with a clipboard while they were together in an enclosed stairwell. She turned around and gave him a look that she thought would put an end to such behavior. About a week later, he again approached her from behind and squeezed her buttocks while she was waiting for an elevator. A short time later Hathaway told Norris not to touch her again

because it made her feel uncomfortable and she did not like it. Norris looked displeased and responded by saying "well" and laughing. Hathaway stopped working with Norris and avoided talking or interacting with him.

After Hathaway rebuffed Norris' advances, he began to snicker and laugh at her, making guttural noises when she walked by him. He also stared at her with a menacing look. Starting in January of 1993, a coworker and friend of Norris, Dennis Wynn, began to act similarly whenever he saw Hathaway. At four different points in her trial testimony Hathaway imitated for the jury the sounds made at her by Norris and Wynn. The sounds could not be captured in the trial transcript, but at oral argument her counsel described one as a purring or growling noise made in the throat and defense counsel described another as a clicking of the tongue. Norris and Wynn continued to leer, snicker, laugh, and make insinuating noises for the next eight months.

Hathaway described for the jury how she felt every day when she went to work and what it was like for her to carry out her duties under these conditions. She was very upset and afraid because she believed that Norris intended to retaliate against her for turning down his sexual overtures. Hathaway explained that her fear was based on what she felt was a connection between Norris' advances and physical touchings and the sounds he and Wynn made whenever they saw her. She was intimidated by the snickers and noises and became very anxious, avoiding Norris and Wynn by hiding in the bathroom and worrying about what they would do next. Hathaway testified that she was depressed and lost interest in doing anything outside of work. She was unable to sleep at night and found that she did not care whether she got out of bed in the morning. She was tired all the time and no longer cared about her job. She felt that her job performance was deteriorating because of her feelings of anxiety, depression, and indifference.

On January 19 Norris and Wynn reported Hathaway to a supervisor for mislabeling mail, and she believed that their report was further retaliation for rejecting

Norris. There was conflicting evidence at trial about the mislabeling incident. The evidence in Hathaway's favor indicated that incorrect labels had been put in the flat sorter by other clerks and that she was replacing them when Wynn walked by. He summoned Norris and they reported the incorrect labels to her supervisor. Norris acknowledged at trial that Wynn did not need to check with him about the labels. Wynn was unable to identify the incorrect labels when he tried to talk with Hathaway about the situation, and later that day he snickered and laughed as he walked by her work station.

When Hathaway was forced to work near Norris and Wynn, her anxiety level increased. On one occasion in early February of 1993, she was in the small label room on the mezzanine manually stamping labels. The room was a narrow one, just wide enough for a table running the length of the room with three chairs behind it. She was working from a chair against the wall opposite the entrance when Wynn came in and sat in the closest chair between her and the door, followed by Norris who entered and seated himself on a ledge directly behind her after plugging in his portable television. Hathaway testified that she was scared to death and did not dare to move or leave the room because that would involve passing very close to both men. She stayed where she was until her boyfriend, Chuck Prestito, arrived and the other two left. Later in February, Hathaway's duties on the flat sorter were given to Wynn, and she was required to do manual flat sorting in close proximity to him.

Hathaway reported the harassment to the equal employment opportunity (EEO) office at the postal facility on January 20, 1993. The previous day she had received a written statement from John Gladfelter who had seen Norris hit her on the buttocks in December. His statement described what he had seen and supported her claim. She reported that Norris had touched her twice on the buttocks and that he and Wynn had been leering at her, making strange noises, and snickering. She told the EEO counselor/investigator, Nikki Neagu, that she wanted the harassing behavior to stop. Neagu told Hathaway she needed to discuss the incidents with John Wacha, the

supervisor of Norris and Wynn, before EEO could take any action. The postal service sexual harassment policy states that employees may report sexual harassment to an impartial supervisor, but not that they must do so. Hathaway agreed to talk to Wacha, but indicated to Neagu that she did not think he would assist her because he was a friend of Norris. Neagu did not explain to Hathaway the process for filing a complaint, nor did she give her any brochures on sexual harassment or on postal service policy for handling these kinds of complaints.

Hathaway took complaints of sexual harassment to supervisor Wacha on two occasions -- on January 20 after talking to EEO and again in February after she was crowded in the label room. She informed him that she had a witness to one of the physical incidents and requested that Norris and Wynn be kept away from her or that something be done to stop their harassment of her. Wacha did not ask to see the witness statement or even ask for the name of the witness. Hathaway asked Wacha to sign a statement verifying that she had reported her allegations to him in order to let the EEO office know that she had followed its directions. Wacha refused to sign the statement that she had drafted and did not offer to write or otherwise alert EEO that she had contacted him about her concerns.

Wacha testified at trial about his normal procedure in investigating a complaint of sexual harassment. He said he would interview the parties involved and any witnesses and then make a written report of his investigation and conclusions. In response to Hathaway's complaint he discussed her allegations with Norris and Wynn who both denied that they had engaged in any harassing conduct. He never attempted to identify or speak to Hathaway's witness and did not interview her again before completing his investigation. Wacha testified that he instructed Norris and Wynn to stay away from Hathaway after her first complaint in January, but he did not reprimand them for disobeying that instruction after she reported that they had crowded into the small label room with her in February. Wacha said no one had witnessed any of the incidents and he had concluded that Hathaway's allegations were untrue. He thus

ignored the existence of a corroborating witness and never made a written report of his investigation or notified Hathaway of the results.

Hathaway also made repeated complaints to the lead plant manager of the Omaha postal facility, Mike Matuzek, and to the EEO office, none of which produced any change in her work environment. These reviewers focused on her claim of retaliation rather than on her sexual harassment complaint. Her first letter to Matuzek stated she had been told that her only available remedy for Norris' physical advances and the subsequent harassment directed at her was to report them to his supervisor but that supervisor was not impartial. She asked Matuzek for guidance as to what she could do to stop the offensive behavior; she never received a response. Matuzek testified that he did not recall having seen her first letter, but it was produced at trial with a date stamp on it indicating that it had been received sometime in February. After her expediting duties were reassigned to Wynn, Hathaway wrote to Matuzek again to ask whether the reassignment had anything to do with her earlier letter. Matuzek responded to this letter, but he did not address her references to her previous request for his assistance or her concerns about sexual harassment. He only stated that her expediting duties had been shifted to someone who had been underutilized.

Hathaway submitted a request for counseling to the EEO office on February 22. That office issued her a notice repeating Matuzek's message about the reassignment without discussing her sexual harassment complaint. EEO informed her that she had a right to file a formal complaint of discrimination if its response did not resolve her concerns. She filed a formal complaint on March 22, 1993, requesting that Norris be transferred to another area and that she be given back her duties on the flat sorter.

Hathaway also sought outside assistance at this point. She was a resident of Iowa, and she contacted Senator Tom Harkin who wrote a letter to Matuzek asking him to review the issues raised by her complaints of sexual harassment and retaliation. Hathaway later met with the local president of the postal workers union, Jim Strawn,

to tell him her working conditions had become unbearable.  Strawn wrote a letter to Matuzek asking management to correct the environment of ongoing sexual harassment.  Matuzek did not respond by looking into Hathaway's work environment; instead he gave both Senator Harkin and Strawn a status report that did not contain any substantive information or indicate any management attempt to remedy the situation.

Two of Hathaway's coworkers, John Gladfelter and Kenneth Haines, corroborated her story.  Both testified that between August and December of 1992 they would often see Hathaway and Norris working together.  Whenever Haines encountered Hathaway and Norris in the mezzanine label room and engaged her in conversation, Norris would get upset and leave abruptly as if he were disturbed that someone else was talking to her.  Gladfelter spoke to Hathaway shortly after he saw Norris hit her on the buttocks to tell her he had seen the incident, was surprised by it, and expected her to be upset and offended.  Hathaway asked him to give her a written statement to help her establish the facts necessary to file a sexual harassment complaint, and he furnished it on January 19, 1993.  Gladfelter testified at trial that he never saw Hathaway and Norris working together again after the incident.  Neither Gladfelter nor Haines was interviewed by EEO staff or management.

On November 3, 1993, Hathaway received a letter from EEO stating that the investigation of her complaint had been completed.  She was provided with a copy of the investigative file and told that she could request either a hearing before an administrative judge from the Equal Employment Opportunity Commission or a final agency decision from the postal service on her complaint.  She requested the latter, and the postal service issued a decision finding that she had failed to establish her claims of hostile environment sexual harassment and discriminatory retaliation.

Hathaway filed suit in federal court, claiming that the pattern of harassing conduct by Norris and Wynn after her rejection of Norris' physical advances made her afraid and anxious and that it discriminatorily altered her working conditions.

Hathaway presented evidence that management ignored her repeated complaints, failed to investigate or take any kind of corrective action, and retaliated against her by removing her more highly paid duties. Runyon argued that Hathaway's allegations were vague and unsubstantiated and were motivated by reports Norris and Wynn made about mislabeled mail and a threat from Chuck Prestito.[1] Runyon also claimed that management had conducted a proper review and noted that Norris and Wynn had filed state court defamation suits against Hathaway because they were afraid of losing their jobs because of her allegations. Hathaway argued that the defamation actions were merely an attempt to intimidate her into dropping her allegations and that Wacha assisted Norris and Wynn in bringing them.[2]

The jury deliberated one full day and returned a verdict rejecting Hathaway's retaliation claim but awarding her $75,000 in compensatory damages on her sexual harassment claim. The district court ordered judgment entered in defendant's favor after it granted his motion for judgment as a matter of law. It believed that there was insufficient evidence for Hathaway because "if that type of conduct can rise to the level of a sexual harassment claim in this country, we're in deep trouble because it does go on in the workplace." Although the court said that it was giving her the benefit of inferring that the snickering and laughing "grew out of" the buttocks touchings, it said that she had not been "subjected to sexually motivated conduct" other than for those two incidents. It found both that the conduct was not severe enough to affect "a

---

[1]Wynn complained on January 20 that he had been threatened by Prestito the prior evening after he had reported the mislabeling. Prestito was sent home as a result, but was later allowed to return after an investigation revealed that there had been no physical threat. Hathaway also made her complaint to the EEO office and Wacha on January 20, but before Wynn reported Prestito.

[2]Wynn won a damage award of $1,000 on his defamation claim, and an appeal is pending in the Norris case from a finding that the allegedly defamatory statements were true.

reasonable person in the plaintiff's position" and "specifically that the management . . . did implement proper remedial action."

On appeal, Hathaway contends that the district court misapplied governing law in overturning the jury verdict and did not consider the evidence in the light most favorable to her. She argues that there was sufficient evidence for the jury to conclude that she was forced to work in a discriminatorily hostile work environment and that management failed to take appropriate remedial action in response to her repeated complaints. Runyon responds that Hathaway failed to demonstrate that the behavior at issue was sex based, that it was sufficiently severe or pervasive to constitute a hostile work environment, and that management's remedial efforts were insufficient. Runyon does not, however, challenge the amount of compensatory damages or contend that the court erred in the admission of evidence or in instructing the jury.

II.

The law places a high standard on overturning a jury verdict. Judgment as a matter of law is proper "[o]nly when there is a complete absence of probative facts to support the conclusion reached" so that no reasonable juror could have found for the nonmoving party. See Ryther, 108 F.3d at 836, 845 (quoting Lavender v. Kurn, 327 U.S. 645, 653 (1946)). On such a motion the court must assume as proven all facts that the nonmoving party's evidence tended to show, give her the benefit of all reasonable inferences, and assume that all conflicts in the evidence were resolved in her favor. See id. at 844 (quoting Haynes v. Bee-Line Trucking Co., 80 F.3d 1235, 1238 (8th Cir. 1996)). The grant of a motion for judgment as a matter of law will only be affirmed when "all the evidence points in one direction and is susceptible to no reasonable interpretation supporting the jury verdict." Mears v. Nationwide Mut. Ins. Co., 91 F.3d 1118, 1122 (8th Cir. 1996). The question of whether there is sufficient evidence to support a jury verdict is a legal one, see Jarvis v. Sauer Sundstrand Co., 116 F.3d 321, 324 (8th Cir. 1997) (quoting White v. Pence, 961 F.2d 776, 779 (8th Cir. 1992)), and

the district court's decision to grant a motion for judgment as a matter of law is therefore reviewed de novo, see Gardner v. Buerger, 82 F.3d 248, 251 (8th Cir. 1996).

Title VII is violated when workplace harassment based on sex creates a hostile work environment. See Meritor Sav. Bank v. Vinson, 477 U.S. 57, 66-67 (1986). To be actionable, the sexual harassment must have been "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." See Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (quoting Meritor, 477 U.S. at 67). A single offensive utterance or exposure to distasteful conduct does not rise to the level of a Title VII violation. See Meritor, 477 U.S. at 67; Lam v. Curators of the Univ. of Mo., 122 F.3d 654, 656-57 (8th Cir. 1997). The plaintiff must show both that the offending conduct created an objectively hostile environment and that she subjectively perceived her working conditions as abusive. See Harris, 510 U.S. at 21-22.

Evidence of conduct that creates a workplace permeated with "discriminatory intimidation, ridicule, and insult" establishes a hostile environment claim under federal law. See id. at 21. Title VII does not, however, create a cause of action for all unpleasant or abusive behavior in the workplace. Rather, the plaintiff must show that the conduct was discriminatory in nature and that she was singled out for such treatment on the basis of her membership in a protected category under the statute. See, e.g., Kopp v. Samaritan Health Sys., Inc., 13 F.3d 264, 269 (8th Cir. 1993) (hostile environment plaintiff must show that harassment was based on sex); see also 42 U.S.C. § 2000e-2(a)(1). In conducting its fact-based inquiry into the severity and pervasiveness of the conduct and into whether it was based on sex, the jury looks at all the circumstances supported by credible evidence. See Harris, 510 U.S. at 23.

While Harris sets out examples of factors that can be considered in deciding whether an environment is hostile,[3] no single factor is required or determinative, and the relevancy and weight of any factor must be evaluated in light of all the facts of a specific case. Id. at 22-23. Justice Scalia pointed out in his concurring opinion that since Congress set no clear standard defining a hostile environment, it must be left to "virtually unguided juries" to decide whether particular conduct is "egregious enough" to merit an award of damages. Id. at 24. There is no bright line between sexual harassment and merely unpleasant conduct so a jury's decision must generally stand unless there is trial error. Baskerville v. Culligan Int'l Co., 50 F.3d 428, 431 (7th Cir. 1995) (Posner, J.) (judgment for the plaintiff reversed where there was no physical touching, behavior was not threatening or intimidating, and management took appropriate remedial steps).

In this case the jury was instructed that Hathaway had to prove six elements in order to prevail:

(1) that she "suffered from discrimination because of her sex by the intentional conduct of her fellow employees consisting of unwelcome sexually motivated conduct or other unwelcome conduct which was directed at [her] because she is female;"

(2) that "such conduct was sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment;"

(3) that "such conduct detrimentally affected" her;

---

[3]These factors "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." 510 U.S. at 23.

(4) that "such conduct would have detrimentally affected a reasonable person in [her] position;"

(5) that "management level employees knew, or should have known of such conduct;" and

(6) that "management level employees failed to implement proper remedial action."

When viewed in the light most favorable to Hathaway, the evidence presented to the jury, together with all reasonable inferences from it, was sufficient to support the jury's finding that she was subjected to hostile treatment on the basis of her sex and to abusive working conditions. Hathaway was physically touched in a sexually suggestive and intimate manner on two occasions by a coworker who had expressed a sexual interest in her. After she rebuffed his advances, Norris and his friend Wynn proceeded to laugh, snicker, and make suggestive noises at her for a period of eight months. This treatment frightened and intimidated Hathaway. She feared that Norris would fondle her again or undermine her work performance which he and Wynn did by wrongly reporting her for mislabeling mail. She testified that she was terrified to pass within grabbing range of either Norris or Wynn and that she felt trapped when they blocked her exit from the narrow label room. The jury heard Hathaway reproduce the noises that disturbed her, and it credited her position that this pattern of behavior created a hostile work environment related to Norris' earlier advances. See Hirase-Doi v. U.S. West Communications, Inc., 61 F.3d 777, 780-83 (10th Cir. 1995) (a few incidents of unwelcome physical touching combined with winks and intimidating stares with possible sexual overtones is sufficient to establish a hostile environment).

A work environment is shaped by the accumulation of abusive conduct, and the resulting harm cannot be measured by carving it "into a series of discrete incidents." Burns v. McGregor Elec. Indus., Inc., 955 F.2d 559, 564 (8th Cir. 1992). Although the district court correctly stated that the inference had to be drawn that the pattern of

-12-

conduct presented in this case was all related, it did not proceed to review the sufficiency of the evidence in that light. The humiliating and intimidating effect of the snickers and noises on Hathaway could have been interpreted by the jury to be caused by the nexus between that behavior and Norris' earlier sexual overtures. See King v. Hillen, 21 F.3d 1572, 1583 (Fed. Cir. 1994) (plaintiff's perception of any one incident of harassment should be determined in the context of all incidents (citing 29 C.F.R. § 1604.11(b))). The jury could reasonably have decided on the basis of this interpretation of the evidence that Hathaway was the victim of menacing sex-based treatment that stemmed from her rejection of Norris' sexual interest in her.

Not every aspect of a work environment characterized by hostility and intimidation need be explicitly sexual in nature to be probative. See Kopp, 13 F.3d at 269; Hall v. Gus Const. Co., Inc., 842 F.2d 1010, 1014 (8th Cir. 1988). The critical inquiry is "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." See Harris, 510 U.S. at 25 (Ginsburg, J., concurring). Norris directed sexual comments and physical advances toward Hathaway because she was a woman. See Kinman v. Omaha Pub. Sch. Dist., 94 F.3d 463, 468 (8th Cir. 1996) (evidence of sexual advances directed at plaintiff shows that she was targeted because of her sex). There was conflicting evidence that created a jury question as to whether the subsequent behavior of Norris and Wynn grew out of Hathaway's rebuff to the advances made by Norris. The jury was instructed that Hathaway had the burden of demonstrating that the conduct was directed at her because of her sex, and it so found. The jury could also have reasonably found to the contrary. It could have found that there was no connection between the physical advances and the other offending behavior. Either finding would have had support in the evidence, but it was the jury's call. See, e.g., Ryther, 108 F.3d at 845 ("where conflicting inferences reasonably can be drawn from evidence, it is the function of the jury to determine what inference shall be drawn") (quoting Anglen v. Braniff Airways, 237 F.2d 736, 740 (8th Cir. 1956)).

Hathaway's exposure to harassing conduct need not have been continuous in order to have been pervasive. See Smith v. St. Louis Univ., 109 F.3d 1261, 1264 (8th Cir. 1997). Despite her complaints, she was forced to work in close proximity to Wynn, which added to the hostility of her environment. See Konstantopoulos v. Westvaco Corp., 112 F.3d 710, 717 (3d Cir. 1997) (assignment to work in close proximity to harassers is significant factor in totality of circumstances inquiry). The jury was able to evaluate the impact on Hathaway's work environment by hearing her recreate the noises and testify about how they made her feel and by considering the intimidating effect of being alone and cornered by Norris and Wynn in the small label room. See Baskerville, 50 F.3d at 428 (discussing importance of context, presence or absence of other persons, and physical propinquity in evaluating impact of harassment). Under the circumstances the jury could reasonably have found that the harassment was sufficiently severe or pervasive for Hathaway to succeed on her claim.

Runyon contends that a reasonable person would not have been detrimentally affected by the conduct, and that Hathaway was not so affected because she did not seek medical or psychiatric care, miss work, or receive bad performance evaluations. "[T]he test is not whether work has been impaired, but whether working conditions have been discriminatorily altered." Harris, 510 U.S. at 25 (Scalia, J., concurring). Psychological harm is relevant to this inquiry, but the plaintiff is not required to demonstrate medical injury to succeed on her claim. See id. at 22-23. It is sufficient that Hathaway credibly testified that she felt afraid, intimidated, and anxious, and that those feelings had a detrimental impact on her psychological wellbeing and on her ability to perform her work. See Dey v. Colt Constr. & Dev. Co., 28 F.3d 1446, 1454-55 (7th Cir. 1994). As Judge Posner pointed out in Baskerville, "[t]he concept of sexual harassment is designed to protect working women from the kind of male attentions that can make the workplace hellish for women." 50 F.3d at 430. The jury heard Hathaway testify that she felt trapped by Norris and Wynn in the small label room and that she regularly interrupted her work in order to avoid encountering them. That she was still able to complete her assigned tasks does not undermine the jury's

finding that a reasonable person subjected to this conduct "would find, as the plaintiff did, that the harassment so altered working conditions as to make it more difficult to do the job." Harris, 510 U.S. at 25 (Ginsburg, J., concurring) (internal quotation marks and brackets omitted). In this case, Hathaway presented sufficient evidence for the jury to conclude that the discriminatory conduct rose to a level that unreasonably interfered with her work performance.

Once an employee complains to her employer about sexual harassment by a coworker, the employer is on notice and must take proper remedial action to avoid liability under Title VII. See Davis v. Tri-State Mack Distrib., Inc., 981 F.2d 340, 343 (8th Cir. 1992). In reviewing the sufficiency of the evidence to support the jury's finding that management did not adequately respond to Hathaway's complaints, a court must not weigh or evaluate the evidence or consider credibility questions. See Hane v. Nat'l R.R. Passenger Corp., 110 F.3d 573, 574 (8th Cir. 1997). The role of the court is restricted because "if misused, judgment as a matter of law can invade the jury's rightful province." Gardner, 82 F.3d at 251. In this case, the jury had to make credibility determinations in order to resolve the parties' conflicting evidence on the remedial action taken.

The jury clearly focused on the issue of remedial action by the postal service because it requested assistance from the court during its deliberations. It asked the meaning of the word "remedial," and the district court responded with Supplemental Instruction A:

> the word 'remedial' means affording remedy; tending to remedy something; intended to correct a situation.

In returning a verdict in Hathaway's favor the jury necessarily found that management had failed to implement proper remedial action.

The jury apparently did not credit testimony by defense witnesses that management conducted a complete investigation into Hathaway's complaint. No investigation was initiated by the EEO office until Hathaway's second request for assistance. At the time of her first request, she was required to report the situation to Norris' supervisor whom she did not believe to be impartial. After Hathaway complained to Wacha, he failed to interview her only witness to the physical touchings, and he did not produce a written report of his investigation or inform her of the results. Finally, when Hathaway continued to pursue her complaint because the harassment had not stopped, management and EEO staff focused on her claims of discriminatory retaliation, rather than inquiring further into her concerns about continuing sexual harassment. The jury could have concluded on the basis of these facts that management's response to Hathaway's repeated requests for assistance was insufficiently thorough and not conducted in good faith.

In addition to conducting an investigation, the employer must take "prompt remedial action reasonably calculated to end the harassment." Davis, 981 F.2d at 343. Runyon contends that management's response to Hathaway's complaints was sufficient as a matter of law because it could not take disciplinary action on the basis of uncorroborated allegations, and the only available remedy would have been to fire Norris and Wynn. It is not a remedy for the employer to do nothing simply because the coworker denies that the harassment occurred, see Fuller v. City of Oakland, 47 F.3d 1522, 1529 (9th Cir. 1995), and an employer may take remedial action even where a complaint is uncorroborated, see Knabe v. Boury Corp., 114 F.3d 407, 409, 413 & n.11 (3d Cir. 1997). The jury could have found in this case that Hathaway's complaint was not corroborated only because management failed to conduct an adequate investigation before concluding that it had no basis to take disciplinary action.

The district court's finding that "management-level employees did implement proper remedial action" is counter to the jury's finding and could only be reached by independently weighing the evidence presented to the jury, something not permitted in

considering a motion for judgment as a matter of law.  See Stephens v. Crown Equip. Corp., 22 F.3d 832, 834 (8th Cir. 1994).  Hathaway requested that management use disciplinary action to stop the harassment or that Norris and Wynn be transferred to areas where they would not come in contact with her.  Other options would have included scheduling the individuals on different shifts, putting a signed written warning or reprimand in personnel files, or placing the offending employees on probation pending any further complaints.  See, e.g., Knabe, 114 F.3d at 413; Zirpel v. Toshiba Am. Info. Sys., Inc., 111 F.3d 80, 81 (8th Cir. 1997); Intlekofer v. Turnage, 973 F.2d 773, 780 & n.9 (9th Cir. 1992); Ellison v. Brady, 924 F.2d 872, 881-82 (9th Cir. 1991); Barrett v. Omaha Nat'l Bank, 726 F.2d 424, 426 (8th Cir. 1984).  Instead of keeping Norris and Wynn away from Hathaway, postal management assigned Wynn to work more hours in close proximity to Hathaway.  Although Wacha claimed at trial that he had given oral warnings to Norris and Wynn, the jury was free to disbelieve him since he failed to create a written record that he had notified them of the disciplinary policy in cases of sexual harassment.  Wacha's subsequent failure to reprimand Norris and Wynn for cornering Hathaway in the small label room further supported the jury's finding.  Cf. Baskerville, 50 F.3d at 432 (company's response was sufficient as a matter of law where it "took all reasonable steps to protect" plaintiff once she complained to human resources department, including promptly investigating complaint, instructing offender to cease offensive behavior immediately, placing him on probation, and withholding a salary increase for several months).  The jury chose to credit Hathaway's evidence over that of management and that was its right.  See Gardner, 82 F.3d at 251.

Since Hathaway did not appeal from the adverse judgment on her retaliation claim and Runyon did not challenge the amount of compensatory damages awarded, the only question before this court on its de novo review is a simple one -- whether there was sufficient evidence to support the verdict in Hathaway's favor on her sexual harassment claim.  In determining whether a work environment is hostile or abusive the jury looks at the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating

. . . ; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23. The jury was presented with evidence that Hathaway was regularly subjected to offensive, sexually-oriented conduct by two coworkers for more than eight months whenever she encountered Norris and Wynn, that the behavior began after she rebuked Norris for touching and squeezing her buttocks, that she felt threatened when they cornered her in the small label room and when they reported her for mislabeling mail, and that her fear and anxiety about their next move led her to hide from them and made it more difficult to do her job. While there was conflicting evidence about the work environment, it was for the jury to resolve the conflicts, even if the district court believed that it might have decided the issues differently had it been the fact-finder. See In re Knickerbocker, 827 F.2d 281, 287 (8th Cir. 1987). The fact that the jury ruled against Hathaway on her retaliation claim shows that it carefully reviewed the evidence on each claim. There was no basis for the court to substitute its own judgment for the jury findings, see Hane, 110 F.3d at 574; Stephens, 22 F.3d at 834, particularly in light of the pivotal role of a jury in evaluating the hostility of a work environment, see Harris, 510 U.S. at 24 (Scalia, J., concurring).

Viewing all the facts and reasonable inferences in the light most favorable to Hathaway, there was sufficient evidence for the jury to conclude that the entire pattern of hostile conduct arose from the physical touchings and Hathaway's rejection of a sexual overture, that this hostile conduct was based on sex, that it intimidated her and made it more difficult for her to do her job, and that management did not take appropriate remedial measures.

For these reasons the order granting judgment as a matter of law on the sexual harassment claim is reversed and that portion of the judgment is vacated, and the case is remanded for entry of judgment on the jury verdict.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.