# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 05-1748

_____

Jill Cottrill; Mary Combs,

        Appellants,

    v.

MFA, Incorporated, doing
business as MFA Agri-Services,
Inc., a Missouri Corporation,

        Appellee.

Appeal from the United States
District Court for the Western
District of Missouri.

_____

Submitted: November 17, 2005
Filed: April 7, 2006

_____

Before MURPHY, BOWMAN and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Jill Cottrill ("Cottrill") and Mary Combs ("Combs") appeal the district court's[1] order granting summary judgment to MFA, Incorporated, doing business as MFA Agri-Services, Inc. ("MFA"). Appellants brought suit against MFA alleging sex

_____

[1]The Honorable Gary A. Fenner, United States District Judge for the Western District of Missouri.

discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* For the reasons discussed below, we affirm the grant of summary judgment to MFA.

## I.    BACKGROUND

MFA is a regional agriculture cooperative which employs 1900 people, operates 150 retail facilities and is headquartered in Columbia, Missouri. Cottrill and Combs worked for MFA in its Albany, Missouri, retail facility. Cottrill was hired by MFA as a bookkeeper in 1987 and Combs as a part-time bookkeeper in July of 2001. The Albany facility contained one women's restroom, consisting of a single room with a sink, toilet and mirror. The manager of the facility and the appellants' supervisor, Scott Adkins, remodeled this restroom in 1997. During the remodeling, Adkins constructed a peephole through one wall in order to view Cottrill while she was in the women's restroom. On the restroom side of the wall, Adkins installed a two-way mirror. The back of the mirror was covered with black paper except for the portion aligned with the peephole. The peephole went through the restroom wall to an adjoining room that Adkins used as his personal breakroom. There Adkins concealed the peephole with a bookshelf and paneling. Between 1997 and 2001, Adkins used the peephole to observe Cottrill in the restroom two or three times a day. Cottrill did not know or have any suspicion that Adkins was viewing her through the peephole. Adkins also stated that he unintentionally viewed Combs in the restroom once or twice after she began working in the Albany facility in 2001.

Cottrill encountered a sticky substance on the toilet seat in the restroom several times between 2000 and 2002. During each year from 1998 to 2002, Cottrill suffered from rashes from approximately April until early September. Cottrill stated in her deposition that at various times she experienced rashes on her legs, buttocks and

ankles, and a fine rash on her chest and arms. Cottrill was treated by a series of doctors but never received a precise diagnosis. She stated that she did not know what was causing the rash from 1998 until 2000, but believed that the rashes were caused by the sticky substance thereafter. However, in July of 2002, Cottrill told her doctor that she did not know the cause of the rash. Cottrill complained to Adkins, and he replaced the toilet seat two or three times. In addition, on one occasion after using the restroom, Cottrill experienced a burning sensation for thirty minutes and concluded that there must have been a foreign substance on the toilet paper. Combs did not experience skin rashes and stated that she was unaware of Cottrill having rashes during the time that Combs worked at the Albany facility. However, Combs did experience a burning sensation one day after using the restroom and could see a clear, sticky substance on the toilet paper holder. Combs did not know what the substance was nor did she have a suspicion about its origins.

In January of 2002, Combs became suspicious of Adkins. She observed that Adkins followed Cottrill when Cottrill went to the restroom and believed that they were having an affair. However, approximately six months later, she realized that Cottrill was unaware that Adkins was following her. Combs looked inside the breakroom because she suspected that Adkins was doing something inappropriate, but she did not find anything unusual. Combs mentioned her suspicions once to her husband, but she did not tell Cottrill or anyone at MFA about her suspicions, observations or investigation. On the morning of October 17, 2002, when Adkins was not in the store, Combs again looked in the breakroom and this time discovered the peephole. Combs stated in her deposition that until she found the peephole, she did not know what Adkins was doing. David Cottrill, Vice Chairman of MFA's Board of Directors and Cottrill's brother-in-law, was present in the store at the time. Upon finding the peephole, Combs showed it to David Cottrill and explained that she thought Adkins was responsible. Then Combs informed Cottrill about the peephole. Cottrill went home, but Combs stayed for about 20 minutes to finish her work.

-3-

After learning of the peephole, David Cottrill immediately contacted Don Copenhaver, MFA President and CEO. Copenhaver then contacted Bill Streeter, MFA Senior Vice President of Agri-Services; Janice Schuerman, MFA Senior Vice President for Corporate and Member Services, who has responsibility for Human Resources; and Brian Griffith, MFA General Counsel. Streeter contacted Kent Bryan, the Regional Manager and Adkins's supervisor. Within an hour after Combs discovered the peephole, David Cottrill, Copenhaver, Streeter and Bryan were involved in the investigation. Additionally, later that day, Bryan notified Ron Skiles, MFA's Manager of Computer Services.

Bryan, Streeter and Skiles formulated a plan to catch Adkins by installing a video surveillance camera in the breakroom on Sunday, October 20, the earliest possible day it could be done. On Thursday night, Bryan called Cottrill and spoke with her and her husband, Chuck Cottrill. Bryan informed them about the video surveillance plan and told them that Cottrill and Combs should not work on Friday or Saturday and that he would meet with the appellants and their husbands on Sunday evening prior to installing the camera. Cottrill called in sick on Friday, and Combs worked a short day. Neither worked on Saturday. On Sunday night, Bryan, Skiles, Cottrill (Cottrill's husband was in the hospital that day due to a hand injury), Combs and her husband, and David Cottrill and his wife met at the home of Cottrill's mother-in-law. Around 11:30 p.m., Cottrill and others went to the store to set up the camera. Skiles asked for Cottrill's input on the location for the surveillance camera in the breakroom, and Cottrill agreed to its final location. Cottrill's sister-in-law gave her a ride home while Skiles and David Cottrill finished installing the camera.

Cottrill agreed to go into the Albany facility on Monday and use the restroom so that MFA could catch Adkins on video. Cottrill would wear a long shirt to protect herself from exposure to Adkins. Cottrill stated in her deposition that she did not disagree with the idea of identifying the perpetrator, but she also testified that "I

agreed only because I was told that was the only way they could fire him; otherwise, they would just, you know, move him maybe to a different location. . . . [W]e had to have concrete proof that it was him in order for them to fire him." Both Cottrill and Combs agreed during their depositions that MFA did not do anything improper or wrong between October 17 and October 22, 2002.

On Monday, October 21, Cottrill came to work and used the women's restroom four times. Cottrill left the Albany facility between 9:45 and 10:00 a.m. and brought her husband home from the hospital. That night the appellants and their husbands, Bryan, Skiles and David Cottrill met at the home of Cottrill's mother-in-law to view the tape. The tape showed Adkins entering the breakroom and looking through the peephole each time Cottrill used the restroom. The next morning around 7:55 a.m., Copenhaver, Streeter and Griffith spoke with Bryan. Bryan then fired Adkins between 10:00 and 11:00 a.m., and MFA contacted law enforcement. The same day, an MFA employee repaired the peephole and the appellants used the women's restroom. Several days later, the entire wall was replaced. Cottrill and Combs continued working at MFA under a new manager.

On November 4 or 5, Bryan went to the Albany store to see the repairs undertaken to make the restroom secure and to see another peephole that was found. At this time, Cottrill opened the doors on the bookcase in the breakroom, revealing a plastic bag containing clear gelatinous material in a stick form, a bag containing deteriorated plant material, another bag containing a glove and leaves, and a second glove. Bryan thought the leaves were poison ivy. Cottrill stated in her deposition that an agronomist at MFA also thought they were poison ivy, but the agronomist was not deposed. These materials were turned over to law enforcement the same day. A forensic lab found the clear material to be cornstarch. The lab was unable to identify the leaves, apparently because they had deteriorated.

MFA offered counseling to Cottrill and Combs and fully cooperated with law enforcement. Adkins denied placing any foreign substances on the toilet seat or toilet paper holder. However, he admitted to the peeping and pleaded guilty to a class "C" felony of invasion of privacy. After filing discrimination charges with the EEOC and receiving right-to-sue letters, Cottrill and Combs brought an action against MFA for Title VII sex discrimination. The district court granted summary judgment in favor of MFA. On appeal, Cottrill and Combs argue that the district court erred in holding that they had not exhausted their administrative remedies on the disparate treatment claims and in finding that they failed to present a triable issue on the hostile work environment claims. MFA argues that Cottrill and Combs failed to exhaust administrative remedies with respect to their disparate treatment claims and some of their hostile work environment allegations and that they failed to establish a prima facie case of hostile work environment. MFA also contends summary judgment was appropriate because MFA was entitled to the modified *Ellerth/Faragher* affirmative defense under *McCurdy v. Ark. State Police*, 375 F.3d 762 (8th Cir. 2004).[2]

---

[2]The multiple-incident supervisor harassment cases of *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998), both held:

> When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages . . . . The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*McCurdy* was a Title VII hostile work environment action arising from a single incident of supervisor sexual harassment not resulting in a tangible employment action. 375 F.3d at 769. The Eighth Circuit held that the employer was entitled to a modified *Ellerth/Faragher* affirmative defense because the employer took swift and effective action the moment it learned about the harassing conduct and the second

## II.    DISCUSSION

### A.    Disparate Treatment

Cottrill and Combs first argue that the district court erred in dismissing their claims of disparate treatment for failure to exhaust administrative remedies. We review de novo the proper reach of a Title VII claim. *Nichols v. Am. Nat'l Ins. Co.*, 154 F.3d 875, 886 (8th Cir. 1998). A Title VII plaintiff must exhaust administrative remedies before bringing suit in federal court. A claimant must first timely file an administrative charge with the EEOC. 42 U.S.C. § 2000e-5(e); *Nichols*, 154 F.3d at 886. The charge must be "sufficiently precise to identify the parties, and to describe generally the action or practices complained of." 29 C.F.R. § 1601.12(b). If the EEOC gives the individual a right-to-sue letter following the EEOC investigation, the charge limits the scope of the subsequent civil action because "the plaintiff may [only] seek relief for any discrimination that grows out of or is like or reasonably related to the substance of the allegations in the administrative charge." *Nichols*, 154 F.3d at 887. Permitting claims to be brought in court which are outside the scope of the EEOC charge would circumscribe the EEOC's investigatory and conciliatory role and deprive the charged party of notice of the charge. *Kells v. Sinclair Buick-GMC Truck, Inc.*, 210 F.3d 827, 836 (8th Cir. 2000); *Williams v. Little Rock Mun. Water Works*, 21 F.3d 218, 223 (8th Cir. 1994).

In their EEOC charges, Cottrill and Combs stated their charges identically as follows:

---

prong of the affirmative defense was inapplicable to the facts of the case. *Id.* at 771-72.

> My supervisor, Scott Adkins, created a hostile work environment by peeping into the women's restroom for years. Upon discovery of this I reported the peephole and in October 2002 Scott Adkins was caught and confessed. Adkins was convicted of a felony for invasion of privacy in Gentry County, Missouri.

Cottrill and Combs did not allege disparate treatment in their EEOC charges. To establish disparate treatment on the basis of sex, a plaintiff needs to establish, in part, that similarly situated males were treated differently and that she suffered an adverse employment action. *Gilooly v. Mo. Dep't of Health & Senior Servs.*, 421 F.3d 734, 738-39 (8th Cir. 2005). The EEOC charges of Cottrill and Combs allege no facts concerning treatment of male employees nor do they identify any adverse employment action. In fact, it was not until Cottrill and Combs filed their opposition to MFA's motion for summary judgment that they first construed their district court complaint to include claims for disparate treatment on the basis that the conditions of the women's restroom were different from those of the men's restroom. Furthermore, claims for disparate treatment do not arise from nor reasonably relate to the allegations of a hostile work environment as alleged in their administrative charges. An investigation of the peeping activities of Adkins would not reasonably be expected to uncover evidence of the condition of the men's restroom. Although we will "liberally construe an administrative charge for exhaustion of remedies purposes, we also recognize that 'there is a difference between liberally reading a claim which lacks specificity, and inventing, *ex nihilo*, a claim which simply was not made.'" *Parisi v. Boeing Co.*, 400 F.3d 583, 585 (8th Cir. 2005) (quoting *Shannon v. Ford Motor Co.*, 72 F.3d 678, 685 (8th Cir. 1996)). Because the hostile work environment claims were not broad enough to encompass disparate treatment claims, the district court properly dismissed the disparate treatment claims for failure to exhaust administrative remedies.

## B. Hostile Work Environment

On appeal, Cottrill and Combs allege hostile work environment based on the peeping, the alleged contamination of the toilet seat and paper holder and MFA's actions in conducting its investigation to catch Adkins. Because we view the evidence in the light most favorable to Cottrill and Combs, we will assume that Adkins was responsible for the sticky substance on the toilet seat and paper holder.

MFA contends that the appellants failed to exhaust their administrative remedies because their EEOC complaints were based solely on the peeping and failed to mention the contamination and investigation allegations. We reject this argument because all three actions are sufficiently related to be part of the same claim for hostile work environment. The Supreme Court stated that a "hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (quoting 42 U.S.C. § 2000e-5(e)(1)) (holding that an individual could recover for acts occurring outside the statutory time period if at least one act occurred within the time period and the acts were part of the same hostile work environment). The Court explained that "[h]ostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. . . . Such claims are based on the cumulative effect of individual acts." *Id.* at 115. Cottrill and Combs each exhausted administrative remedies with respect to the hostile work environment claims because the peeping, the contaminated toilet seat and the MFA investigation are a related stream of incidents that are part of a single claim for hostile work environment sex discrimination. Because a hostile work environment sexual harassment claim is a single cause of action, the charged party was not deprived of notice of the charge.

Although we find that the hostile work environment claims of Cottrill and Combs properly were exhausted, we affirm the district court's grant of summary judgment. We review a grant of summary judgment de novo, viewing the facts in the light most favorable to the non-moving party. *Pedroza v. Cintas Corp. No. 2*, 397 F.3d 1063, 1068 (8th Cir. 2005). We apply the same standard as the district court and may affirm on any grounds supported by the record. *Simpson v. Des Moines Water Works*, 425 F.3d 538, 541 (8th Cir. 2005). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). At the summary judgment stage, we do not consider portions of depositions that were made without personal knowledge or consist of hearsay. *Murphy v. Mo. Dep't of Corrections*, 372 F.3d 979, 982 (8th Cir. 2004). The allegations of Cottrill and Combs do not create a genuine issue of material fact as to whether the peeping, the foreign substance on the toilet seat and paper holder and MFA's investigation created a hostile work environment.

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Discrimination includes inappropriate conduct that creates a hostile work environment. *See* 29 C.F.R. § 1604.11(a)(3); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). To establish a prima facie case of sex discrimination based on a hostile work environment, a plaintiff employee must establish that (1) she was a member of a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on sex; and (4) the harassment was sufficiently severe or pervasive as to affect a term, condition, or privilege of employment. *Schoffstall v. Henderson*, 223 F.3d 818, 826 (8th Cir. 2000). Here we focus on the fourth element.

To determine whether the harassment affected a term, condition, or privilege of employment, we consider "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher*, 524 U.S. at 787-88 (quotation omitted); *see also Baker v. John Morrell & Co.*, 382 F.3d 816, 828 (8th Cir. 2004). In addition, the "sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher*, 524 U.S. at 787; *see also Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1047 (8th Cir. 2005) ("[A]n employee's admission that [offensive conduct] was not abusive is fatal to the employee's Title VII sexual harassment claim."); *Baker*, 382 F.3d at 828 (stating that "the victim must subjectively believe her working conditions have been altered"). "[I]f the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Harris*, 510 U.S. at 21-22.

We first consider Cottrill's hostile work environment claim. Cottrill was not aware of the peeping, stating in her deposition that she did not know that Adkins was viewing her. Because she did not subjectively perceive the peeping, Cottrill may not rely on the peeping to establish that her work environment was hostile.

A Title VII plaintiff "may only rely on evidence relating to harassment of which she was aware during the time that she was allegedly subject to a hostile work environment." *Hirase-Doi v. U.S. West Communications, Inc.*, 61 F.3d 777, 782 (10th Cir. 1995). Where the plaintiff and her female coworkers were harassed by a male coworker, the Tenth Circuit stated in *Hirase-Doi* that the plaintiff "could not subjectively perceive [her coworker's] behavior towards others as creating a hostile work environment unless she knew about that behavior." *Id.*; *cf. Pryor v. Seyfarth,*

*Shaw, Fairweather & Geraldson*, 212 F.3d 976, 978 (7th Cir. 2000) (noting that supervisor's alleged leering at employee without employee knowing it was irrelevant to employee's Title VII sexual harassment claim); *Burnett v. Tyco Corp.*, 203 F.3d 980, 981 (6th Cir. 2000) (holding that the allegations of plaintiff's co-employees of sexual harassment by manager were irrelevant to plaintiff's hostile work environment claim absent evidence that plaintiff was contemporaneously aware of the alleged harassment); *Bradshaw v. Golden Rd. Motor Inn*, 885 F. Supp. 1370, 1381 (D. Nev. 1995) (holding that supervisor's routine vulgar references to plaintiff could not support a hostile work environment claim because plaintiff was unaware of the comments and "to show that he or she perceived the 'environment' as 'hostile,' [a Title VII plaintiff] must at least have been *aware* of those comments").

In addition, this case is factually distinguishable from *Liberti v. Walt Disney World Co.*, 912 F. Supp. 1494 (M.D. Fla. 1995), cited by the appellants, where the district court denied Disney's motion for summary judgment as to a Title VII claim for hostile work environment based on at least one male employee, John Giangrossi, videotaping and peeping at female Disney dancers in their dressing rooms. Although the plaintiffs were not subjectively "aware of Giangrossi's identity and the exact nature and extent of his activities until after he was apprehended" in January 1992, as early as May of 1991 the dancers were aware of peepholes in their dressing area, in July of 1991 Disney told the dancers not to worry about any problems because a Disney employee had been caught "peeping" and had been fired, "[a]dditional and new holes were discovered after Mr. Giangrossi's arrest and termination, and the Plaintiffs continued to be concerned about the security of their dressing areas after January of 1992." *Id.* at 1499, 1505. By contrast, here there is no question of material fact as to Cottrill's subjective awareness because Cottrill admitted that she had no knowledge of the peeping by Adkins.

Aside from the peeping activities of Adkins, which Cottrill did not subjectively perceive, the contamination of the toilet seat and paper holder and the actions of MFA during its investigation were not so objectively hostile as to poison Cottrill's work environment. *See Tuggle v. Mangan*, 348 F.3d 714, 722 (8th Cir. 2003). With respect to the contamination, Cottrill experienced a burning sensation on only one occasion and rashes over a number of years. However, Cottrill told her doctors and stated in her deposition that she did not know the cause of her skin rashes, which both preceded and continued after Cottrill noticed the sticky substance on the toilet. Regarding MFA's handling of the investigation, Combs informed David Cottrill about the peephole even before she notified Cottrill, causing MFA immediately to launch an investigation. Cottrill did not use the restroom between the time the peephole was discovered and the time Adkins was terminated except to assist with the investigation. Cottrill argues that she was subjected to a hostile work environment by using the restroom on Monday, October 21, in order to assist in catching Adkins on videotape entering the breakroom and looking through the peephole. Yet Cottrill's argument is belied by the fact that she consented to use the restroom on Monday, she wore a long shirt for protection, her husband and other family members were involved in her decision to participate, and she even helped set up the camera in the breakroom and agreed to its location. In addition, after Adkins was fired, Cottrill continued to work in the Albany facility and to use the women's restroom. Although MFA might have been able to devise a different method of identifying Adkins as the peeper without asking Cottrill to participate, Cottrill admitted in her deposition that MFA did nothing improper between October 17 and October 22.

Because Cottrill never subjectively perceived the peeping, in order to evaluate her hostile work environment claim, we focus solely on the contamination of the toilet seat and paper holder and the circumstances of MFA's investigation, which Cottrill actually perceived. Based on the totality of the circumstances of which

-13-

Cottrill was aware, and compared to the facts in other cases in which we have rejected hostile work environment claims, we hold that Cottrill has not established a question of material fact as to whether the alleged harassment was so severe and pervasive as to constitute a hostile work environment at MFA's Albany retail facility in violation of Title VII. *See LeGrand v. Area Res. for Cmty. & Human Servs.*, 394 F.3d 1098, 1100-03 (8th Cir. 2005) (finding no objectively hostile work environment created by defendant's unwelcome sexual advances on three separate occasions over a nine-month period, including asking the employee to watch pornographic movies with him, hugging and kissing, and grabbing the employee's buttocks and thigh); *Tuggle*, 348 F.3d at 720 (holding no actionable hostile work environment based on defendant's inappropriate sexual comments, taking a photograph of plaintiff's rear end and giving plaintiff undesirable work assignments); *Duncan v. Gen. Motors Corp.*, 300 F.3d 928, 933 (8th Cir. 2002) (holding no actionable hostile work environment where co-employee asked plaintiff if she would have a relationship with him, touched the plaintiff's hand on four to five occasions, requested the plaintiff sketch a sexually objectionable planter, asked plaintiff to complete a task on his computer where its screen saver depicted a naked woman, hung an offensive poster, and asked plaintiff to type a document for him containing sexually offensive items). Therefore, the district court did not err in granting summary judgment to MFA on Cottrill's hostile work environment claim.

We next consider Combs's hostile work environment claim. Regarding MFA's plan to catch Adkins on video on October 20, Combs attended the meeting on Sunday night but was not directly involved with the video surveillance the following day. With respect to knowledge of the peeping, when asked in her deposition if she suspected that Adkins was viewing her during the period from July of 2002 until the discovery of the peephole in October of 2002, Combs responded in the negative. Because Combs was not aware that Adkins viewed her through the peephole once or twice, this conduct did not alter the conditions of her employment in violation of Title VII. *See Harris*, 510 U.S. at 21-22.

-14-

However, Combs did suspect that Adkins was engaged in some type of inappropriate conduct. When asked if Combs suspected that Adkins was viewing Cottrill, Combs responded, "I suspected he was doing something. I didn't know what." Combs became suspicious in early 2002, but she did not reveal this to Cottrill or anyone else at MFA prior to discovering the peephole on October 17, 2002. Even if Combs subjectively perceived the environment to be hostile, at most Combs has alleged that she suspected Adkins was doing something inappropriate and that she experienced a burning sensation once after using the restroom at work. Additionally, both before and after she discovered the peephole, Combs was able to perform her employment duties and continued to use the women's restroom in the Albany facility. *See id.* at 23 (directing courts to look at all the circumstances, including whether the alleged harassment unreasonably interferes with an employee's work performance, in deciding whether an environment is objectively offensive). Looking at the totality of the circumstances that Combs perceived, Combs has not established that the alleged harassment was objectively "so intimidating, offensive, or hostile that it poisoned the work environment." *Gilooly*, 421 F.3d at 738 (quoting *Scusa v. Nestle U.S.A. Co., Inc.*, 181 F.3d 958, 967 (8th Cir. 1999) (internal quotation omitted)). Therefore, the district court properly granted summary judgment in favor of MFA on Combs's hostile work environment claim.

The conduct of Adkins was certainly reprehensible. However, for the reasons given above, Cottrill and Combs each failed to present a prima facie case of hostile work environment against MFA sufficient to survive summary judgment. Therefore, we find it unnecessary to address whether MFA is entitled to an affirmative defense.

## III.   CONCLUSION

We hold that Cottrill and Combs failed to exhaust their administrative remedies with regard to their disparate treatment claims and that the district court properly

granted summary judgment on their hostile work environment claims. Accordingly, we affirm the judgment of the district court.

MURPHY, Circuit Judge, concurring in part and dissenting in part.


I concur in much of the court's opinion, but I respectfully dissent from that part dealing with Jill Cottrill's hostile work environment claim because material issues of fact made summary judgment inappropriate on that claim. All factual issues must be viewed in the light most favorable to her as the respondent to the summary judgment motion by MFA. *See Duncan v. Delta Consolidated Industries, Inc.*, 371 F.3d 1020, 1024 (8th Cir. 2004). The majority overlooks evidence in the record from which a fact finder could determine that Jill Cottrill experienced a hostile work environment, including the role she was asked to play in the scenario devised by management to catch Scott Adkins in the act of spying and other acts by managers.


It is undisputed that for some four years Cottrill's privacy was invaded several times each work day when she was spied on while using the women's restroom. Moreover, the perpetrator was her supervisor and store manager Scott Adkins, who had constructed a hidden peephole opening from the women's restroom into a bookcase in his personal breakroom. The record reveals how Cottrill felt about this violation by her reaction on October 17, 2002, when she learned what had been going on. On that day Mary Combs told her that Adkins had a peephole and showed her how he had been able to look into the women's restroom from his breakroom perch while Cottrill used the facilities. Cottrill was so upset that she became physically ill and had to leave work and retreat to the privacy of her home.


Senior management also learned the same day that the peephole existed and that Combs had seen Adkins disappear whenever Cottrill left for the restroom. David Cottrill, the vice chair of the MFA board and Jill's brother in law, happened to be in

the store and he passed the information on to company headquarters. Shortly thereafter Kent Bryan, the regional manager to whom Adkins reported, and Billy Streeter, a senior vice president, decided they would try to catch Adkins in the act of peeping rather than confront him about what they had learned. Together with Ron Skiles, the computer services manager, they devised a plan to install a hidden camera in Adkins' breakroom and have Jill Cottrill use the toilet in the women's restroom to lure Adkins into peeping on her.

Bryan also talked to David Cottrill, who arranged a meeting the following weekend at his mother's house. At the meeting Jill Cottrill was presented with the bait and tape plan devised by the managers. She was told that the only way Scott Adkins, who was close to both Bryan and David Cottrill, could be discharged would be if he were caught on videotape while he was spying on her. She would need to act as a lure by using the facilities in the women's restroom and would have to expose herself multiple times because the managers wanted more than one "hit." Cottrill testified in her deposition that she was uncomfortable with the plan, but was told "that was the only way they could fire him." When she exhibited her reluctance to expose herself, the managers agreed she could wear a long shirt for protection. The following Monday she used the toilet in the women's restroom four times while Adkins observed her through the peephole and was caught on videotape. Cottrill testified that before they watched the videotape, she heard Bryan say: "If he only did it once, let's don't do anything." Cottrill testified that the entire experience left her "just in a state of shock and kind of a daze" and that she felt "just devastation." She has since sought counseling which is still ongoing.

At oral argument counsel for MFA responded in the affirmative when asked if any human resources personnel had participated in devising the bait and tape plan, but the record does not reflect that. Janice Schuerman, the vice president responsible for human resources, was notified about the discovery of the peephole and may have been told about the idea of using surveillance equipment. There is no indication in

the record, however, that she or anyone from her department was involved in the decision to have Cottrill lure Adkins into peeping by using the restroom four different times while he watched. Instead three male managers with other responsibilities devised the scenario in which Cottrill was required to play an embarrassing and demeaning role, repeatedly serving as bait while engaging in what are normally very private acts (as opposed to combing her hair or checking her makeup, for example), despite the considerable circumstantial evidence that existed about Adkins' surreptitious spying.

There are other genuine issues of material fact in the record. Cottrill testified that Adkins had treated her in a "Jekyll-and-Hyde" manner for several years prior to her discovery of the peeping and had been arbitrary and "very controlling" about her time off. This treatment was upsetting enough to lead her to inquire about other work in 2001. During that same time period both urine and a clear sticky substance began appearing on the toilet seat in the women's restroom, causing Cottrill to complain repeatedly to Adkins and to request a lock for the outside door. Cottrill also testified that she suffered from a serious and persistent rash which caused swollen red bumps and ridges to appear on her buttocks and the back of her legs. The rash was so debilitating that she had trouble walking and repeatedly needed medical attention. According to Cottrill it was similar to rashes developed by other employees who used the women's restroom, and it disappeared after Adkins was terminated. Combs also testified about foreign substances on the toilet seat and the toilet paper and about a "terrible" burning sensation she experienced after using the facilities. Two weeks after Adkins was discharged, three bags containing organic substances and a pair of gloves were found in the bookcase in his breakroom. One bag contained soluble corn starch, which could have been the clear sticky substance on the toilet seat, and Cottrill testified that MFA agronomist Lyndon Brush told her he was "99 percent sure" that there was poison ivy in the other two bags. There was in addition evidence that MFA failed to cover up other peepholes into the women's restroom, including a hole in the ceiling above the toilet.

Although Cottrill was offered and received counseling after Adkins was discharged, she testified that Bryan first delayed her worker compensation claim to pay for the counseling and then only "reluctantly" authorized it. He then persistently asked her when she would be "about done," and shamed her publicly by telling her new manager to make sure that all her fellow employees knew how much worker compensation claims like her's were costing the company. Bryan also told her that she should simply "get over" and "forget" what had happened, became highly critical of her work, and forced her manager to go over what she did "with a fine-tooth comb."

As the majority recounts, there was indeed countervailing evidence in the record. This included accounts by other MFA employees such as Bryan and Streeter, possible other causes for Cottrill's rash, and her conflicting deposition testimony.[3] Weighing the value of conflicting evidence is improper on summary judgment, however, and all facts and the fair inferences from them must be viewed in the light most favorable to Jill Cottrill. *See Brosseau v. Haugen*, 543 U.S. 194, 194 n.1 (2004).

Conduct giving rise to an actionable hostile work environment under Title VII includes not only sexual advances and demands for favors but all "sexually demeaning" behavior which alters the terms or conditions of work. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752 (1998). The question to be resolved is whether the environment was one "that a reasonable person would find hostile or abusive, and ... that the victim did in fact perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998); *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22

---

[3]Although Cottrill responded "no" to opposing counsel's deposition question about whether MFA did anything improper after the discovery of the peephole, she made it clear that she had only agreed to subject herself to further peeping because management said that Adkins would not otherwise be discharged.

(1993).  Whether a hostile workplace existed for Jill Cottrill must be based on the totality of the circumstances affecting her since a "work environment is shaped by the accumulation of abusive conduct, and the resulting harm cannot be measured by carving it into a series of discreet incidents."  *Hathaway v. Runyon*, 132 F.3d 1214, 1222 (8th Cir. 1997) (internal quotations omitted).  If there is a nexus between abusive conduct by a supervisor based on sex and other acts in the workplace, all may be considered together in establishing a prima facie claim.  *See id.* (snickers and acts linked to previous sexual advances relevant to hostile work environment claim); *see also Van Steenburgh v. Rival Co.*, 171 F.3d 1155, 1159 (8th Cir. 1999) (non sexual incident within statute of limitations actionable if related to time barred sex based incidents).  Acts by supervisors generate special concern, as "courts have consistently held" that they have "greater power to alter the environment than acts of coemployees generally."  *Faragher*, 524 U.S. at 805.

MFA argues that under our decision in *McCurdy v. Ark. State Police*, 375 F.3d 762, 771-72 (8th Cir. 2004), it is entitled as a matter of law to a modified version of the affirmative defense articulated in *Ellerth*, 524 U.S. at 765, and *Faragher*, 524 U.S. at 806-07, even if there are triable issues of material fact on Cottrill's hostile work environment claim.  It contends that it had policies prohibiting sexual harassment and that it exercised reasonable care to correct the situation.  Yet a fact finder could determine that MFA's policies were illusory since they had not provided an effective check on Adkins and they were not consulted in formulating the company's response to his behavior.  If the record were viewed in a light most favorable to Cottrill, a reasonable fact finder could determine that MFA's response was designed to protect Adkins rather than his victim.  *See McCurdy*, 375 F.3d at 771 (no liability for supervisor harassment where employer takes "swift and *effective*" remedial action) (emphasis added).  Moreover, the parties agree that Cottrill and Combs periodically brought the problems in the women's toilet area to Adkins' attention and that he merely replaced the toilet seat several times.  Although Cottrill did not make a complaint about his "'Jekyll and Hyde" behavior, she testified

in her deposition that this was because she was aware that Adkins was close to regional manager Bryan and she therefore feared retaliation. In sum, the record reveals that there are also issues of material fact related to MFA's affirmative defense.

The grant of summary judgment to MFA on Jill Cottrill's hostile work environment claim should be reversed, and this claim should be remanded for trial.

_____